**ALABAMA AND COUSHATTA TRIBES OF TEXAS, a sovereign Indian Nation, et al., Plaintiffs,**

v.

**TRUSTEES OF the BIG SANDY INDEPENDENT SCHOOL DISTRICT, et al., Defendants.**

**No. 9:92 CV 170.**

United States District Court, E.D. Texas, Lufkin Division.

March 12, 1993.

---

Donald Juneau, Richard B. Sobol, New Orleans, LA, for plaintiffs.

Michael Ray Buchanan, Dallas, TX, Jerry L. Hatton, Beaumont, TX, for defendants.

## MEMORANDUM OPINION

JUSTICE, District Judge.

Plaintiffs, Native American students and their tribe, have applied for a preliminary injunction in the above-styled civil action. A hearing on their application was held on January 4, 1993. Plaintiffs contend that the dress code promulgated and enforced by the Big Sandy Independent School District violates their constitutional right to the free exercise of religion, in conjunction with other First and Fourteenth Amendment rights. Because plaintiffs have stated a "hybrid claim," the dress code regulation will be subjected to the highest level of scrutiny.

The findings of fact and conclusions of law relating to this action are set forth in this memorandum opinion. Unless specified to the contrary, the individual witnesses' testimony was adopted in the findings of fact.

## I. *Findings of Fact*

Plaintiffs, the Alabama and Coushatta Tribes of Texas ("Tribe") and twelve Native American students, through their parents and guardians, commenced this action for injunctive relief and monetary damages against the Trustees of the Big Sandy Independent School District ("Trustees"), individually and in their official capacities as Trustees, Thomas Foster, Superintendent of the Big Sandy Independent School District, individually and in his official capacity, and Robert Fountain, Principal of Big Sandy Independent School District, individually and in his official capacity. Plaintiffs allege that their constitutional rights to free exercise of religion and free speech under the First Amendment, and to due process and equal protection under the Fourteenth Amendment, have been violated by a school dress code. A temporary restraining order was issued against the defendants on October 15, 1992.

The Tribe is a sovereign nation recognized as one tribal unit by the United States. 25 U.S.C. §§ 731–737. Historically, the Tribe used, possessed, and occupied a portion of what is known as the Big Thicket in Polk County, Texas. The Alabama and Coushatta Reservation is now situated in Polk County, Texas.

The following persons are members of the Tribe, and are plaintiffs in this action: Gilman Abbey, through his parent and guardian, Arlene Abbey; Harris Thompson, Jr., through his parent and guardian, Harris Thompson, Sr.; Danny John, through his parent and guardian, Joe John; Joslynn and Ian Liscano, through their parent and guardian, Rowena Liscano; Lonnie Williams, through his parent and guardian, Laberta Williams; Maynard, Simeon, Emmanuel, and Seth Williams, through their parents and guardians, Waynne and Leonard Williams.

The Big Sandy Independent School District has enforced a dress code restricting the hair length of all male students for the past twenty-five years. The current version of the regulation provides as follows:

> Boys' hair should be of reasonable length and style so as not [to] interfere with the instructional program. Boys' hair should [be] no longer than the top of a standard dress collar.

It does not appear that the hair code was enacted for any discriminatory purpose, but for the following reasons:

a. To create an atmosphere conducive to learning and to minimize disruptions attributable to personal appearance, conduct, grooming and hygiene, and attire.

b. To foster an attitude of respect for authority, and to prepare students to enter

the workplace, which often has rules regarding dress, conduct and appearance.

c. To ensure that the conduct and grooming of students who represent the District in extracurricular activities create a favorable impression for the District and the community.

Eighty-nine students at the Big Sandy Independent School District are members of the Tribe. The Native American male students who are named plaintiffs in this action wear their hair long, in violation of the school's dress code.

One of the plaintiffs, Gilman Abbey, age seventeen, a tenth grader, was told by Robert Fountain, Principal of Big Sandy, to cut his hair at the beginning of the school year. Abbey refused, and, on September 2, 1992, he was taken out of scheduled classes and placed in in-school detention. School officials also threatened to discipline Maynard, Simeon, Emmanuel, and Seth Williams on the first day of school for wearing their hair long. These students cut their hair after Fountain told them they could not return to school until they did.

On September 16, 1992, Ian Liscano, a seventh grade student, and Joslyn Liscano, a fifth grader, were placed in in-school detention for wearing their hair long. Danny John, an eleventh grader, and Harris Thompson, Jr., a tenth grade student, were placed in in-school detention on September 21, 1992, for having long hair. On September 29, 1992, Lonnie Williams, an eighth grade student, was placed in in-school detention for the same reason.

Although there were students other than Native American students placed in in-school detention, the only students who were disciplined for violation of the prohibition on long hair were Native Americans.

Foster testified that the school's general practice is to give a three day written notice before students are suspended. He assumed, but did not know for certain, that the practice was followed with regard to these students. Foster did not know whether students and parents are informed of their right to appeal in-school detention to the Board. There was no evidence that the plaintiffs' parents were given notice of the suspensions, or told of any avenues of appeal.

While in detention, a student receives his assignments, but is not given regular instruction by the teacher of the subject. A teacher's aide, Marilyn Langley, presides over the students in detention, and provides some assistance to the students. Langley has a college degree in business, but does not have a teaching certificate. Regular teachers schedule conference periods, during which time they are available to assist the suspended students upon the students' request.

The plaintiffs generally fell behind in their school work while they were suspended, in comparison to the students who attended regular classes. Danny John testified that he fell somewhat behind while he was suspended, but worked hard to keep up, and attended extra tutoring sessions after school during his suspension. He stated that Langley was only able to give him limited assistance, and that he needed access to the teachers for each of his regular classes. Langley testified that John was receptive to her assistance, and that he frequently requested conferences with his regular teachers so that he could keep up with the other students.

Gilman Abbey testified that, although he and the other Native American students were allowed to return to regular classes in October, because of the temporary restraining order issued by this court, he is still behind in his work, especially in geometry. Langley stated that Abbey was not receptive to her assistance, but that he was a poor student who would be a poor student whether he was in in-school suspension or not.

At the preliminary injunction hearing, a witness for the plaintiffs, Hiram F. Gregory, Ph.D., an anthropologist specializing in southeastern Native American tribes, testified that, prior to the 1900's, many southeastern tribes wore their hair long as a symbol of moral and spiritual strength. It was a common Native American belief that the hair, similar to other body parts, was sacred, and that to cut the hair was a complicated and significant procedure. A hair cut was considered the equivalent of dismemberment of a body part. Generally, hair was to be cut

only as a sign of mourning a close family member's death. Southeastern tribes believed that, to cut the hair at any other time, without the safeguards of tribal ritual, would disrupt the "oneness" of that person's spirit and subject that person's body to invasion by witchcraft.

While Dr. Gregory was able to testify extensively about the religious practices of southeastern Native American tribes in general, he stated that there is a lack of detailed information about the Alabama–Coushatta Tribe's traditional beliefs. The Tribe believes that its traditions and religious beliefs are the property of the tribal people, and has adopted taboos prohibiting the sharing of such information with outsiders.

Dr. Gregory testified that the Tribe traditionally engaged in a form of shamanism or animism, where everything in nature is believed to be sacred and filled with a spirit. Before the Tribe's conversion to Christianity, the Tribe relied heavily on medicine men, who were responsible for healing people, controlling events, and divining the future.

The Tribe was converted to Christianity in the 1890's by Presbyterian missionaries. The missionaries urged tribal members to give up traditional practices, such as playing stick ball and dancing, which were manifestations of native religious beliefs. During the early 1900's, there was immense pressure on Native American peoples, including the Tribe, to adapt and become assimilated into the Caucasian culture. The assimilative process included pressure on Native American men to cut their hair short, in imitation of the hair styles of white men.

After the conversion to Christianity, tribal members continued to practice their ancient religious beliefs and traditions, as they did not believe that Christianity and Native American religion were mutually exclusive concepts. To the southeastern Native American tribes, traditional practices could harmoniously coexist with Christian practices. Both were part of an overall belief system, which encompassed every aspect of a tribal member's life, and which was not limited to

formal religious practices which took place on a regular schedule in a church or temple.

Today, the Tribe encourages its members to obtain an education, for the purpose of competing for employment off the reservation, while retaining traditional culture to the extent possible. Many tribal members still speak their own languages and observe Native American customs and practices, including participating in ceremonial dances, called celebrations or pow-wows, and dance competitions. Celebrations are dances held as expressions of Native American tradition and religious belief, and also as individual artistic statements. Many of the dancers wear Native American costumes and hair styles.

Another practice which has survived the conversion to Christianity and adaptation to Caucasian culture is the ritual of cutting a child's hair at a certain age. Members of the Tribe's kindred Coushatta nation, residing in Louisiana, continue to cut their children's hair at the age of four months, an event which holds great cultural significance to the family and the tribe.[1]

There has been a strong movement in North America in recent years among younger Native Americans, including members of the Tribe, to return to their traditional culture and heritage. Instead of attempting to revive each independent tribal religion, many traditional Native American religions are now practiced by young people in a combined fashion. One facet of this "Pan–Tribal" movement is the wearing of long hair.

Abbey testified that his desire to wear his hair long was reinforced when he attended the Heart of the Earth Survival School in Minneapolis, Minnesota, during the summer of 1992. The school was a part of the American Indian Movement ("AIM"), and approximately two hundred students, grades kindergarten through twelfth, were involved. The school taught the students that long hair has religious significance, and that it is part of their Native American heritage. Abbey believes that the only time he should cut his hair is to show mourning when a close family

1. The Louisiana Coushatta nation is closely related to their Texas cousins. Both were converted to Christianity during the same time period.

While each nation has its own language, many tribal members speak both languages, and members frequently intermarry.

member dies. However, Abbey has been baptized in the Christian faith, and occasionally attends a Christian church.

Danny John testified that he believed that hair was part of his religion, as well as his Native American culture and tradition. He has heard about the religious significance of long hair from tribal elders. John thought of his hair as a part of his body, similar to a finger or other appendage. He believed that, if his hair were cut, he would spend the afterlife searching for that missing hair. To have long hair is a personal decision of his, which is supported by his parents. John has been baptized in the Christian faith, but has renounced the Christian religion in favor of a Native American religion.

Both Abbey and John participate in the ceremonial dances. Both perform the "fancy" feather dance, which is a form of celebration. The participants wear costumes, and many, but not all, fancy dancers have long hair. It is traditional to braid the hair for the dance. Abbey testified that his spirit is released through the dance. John testified that the fancy dance, as well as the round and the buffalo dance, is like a modern-day battlefield, where the dancers, including himself, often compete against other tribes. He also stated that dancing transported him back to the spirit world.

The Tribe and the parents of the students disciplined for wearing their hair long encourage and support their children's participation in celebrations, pow-wows, and other Native American ceremonies and cultural activities. The Tribe and the parents, while not requiring young men to wear their hair long, approve of the practice because of its religious significance, and because of the desire to preserve the Tribe's cultural heritage and traditions. Battise and the tribal council feel concern about the isolation which their young people feel in school as a result of the problems caused by the hair issue.

Plaintiffs have established that the minor members of the Tribe have a sincerely held religious belief in the spiritual properties of wearing the hair long. The majority of the

Native American parents of the students do not themselves believe that long hair is a fundamental tenet of their own Christian religious practices; however, the parents fully support their children's belief in the spiritual aspects of hair, and actively encourage their children to respect their tribal heritage and participate in Native American traditions.[2]

Many of the adult male members of the tribe wear their hair short. However, some adult males wear their hair long, including Leonard Williams, the father of plaintiffs, Maynard, Emmanuel, Simeon, and Seth Williams. The children's mother, Waynne Williams, testified that her husband would cut his hair off only if a close family member died. Further, Williams had instructed her to cut his braid off if he died, and to lay it across his chest. She testified that he kept his hair long because of his religious beliefs.

Danny John testified that he has tried to get the Board to change its dress code to allow Native American students to wear their hair long before this fall. He claimed that he asked JoAnne Battise, the tribal administrator, to talk to the Board in this regard during the last school year. Battise testified that she did, in fact, contact Superintendent Foster and Principal Fountain to request a change in the dress code last year, but that nothing was done.

Battise stated that she was never notified that the hair issue had been put on the school board's agenda, but that she and other parents attended a school board meeting on September 1, 1992, to discuss the dress code. Battise testified that the board allowed tribal members to voice their concerns about the hair regulation, but did not vote on the issue at that time. Battise and one of the student's mothers, Waynne Williams, stated that, during the September 1 meeting, a tribal member named Armando Rodriquez informed the board that the desire to wear long hair was based on religion, but that a board member responded by telling him that long hair went out with the hippies.

---

2. The disparity in the beliefs of the parents and their children may be the result of the recent movement among younger Native Americans to

recognize and revitalize their Native American heritage, after more than a century of assimilation into white culture.

According to board minutes, the hair issue was tabled at the September 1 meeting, and the board voted on it at the next meeting on September 14, 1992. Battise testified that the tribal members who were present at the second meeting were not allowed to speak. The dress code remained intact.

A few teachers and teacher's aides testified that, since the entry of the temporary restraining order in this case, they have noticed increased disciplinary problems, such as tardiness, student responses in Alabama–Coushatta language, and racial epithets, and social polarization between the Native American male students and other students. However, trustee Paul Cain testified that, while it could be better, the educational environment at Big Sandy schools has not been diminished. Superintendent Foster was unaware of any major disciplinary problems, and there have been no reports of increased disciplinary problems to the Board. No one could say whether the alleged disciplinary problems were attributable to the wearing of long hair by Native American male students.

## II. Conclusions of Law

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(3) and (4).

Plaintiffs seek a preliminary injunction for the alleged violation of their rights to free exercise of religion and free speech under the First Amendment to the United States Constitution, and to equal protection and due process, as guaranteed by the Fourteenth Amendment to the United States Constitution. Plaintiffs have also asserted a claim for damages under 42 U.S.C. § 1983.

Plaintiffs are entitled to a preliminary injunction if they establish the following elements:

a. There is a substantial likelihood of success on the merits;

b. The injuries threatened if the conduct is not enjoined will be irreparable and irrevocable;

c. The threatened injuries far outweigh any real harm to defendants;

d. The granting of preliminary injunctive relief is in the public interest.

*Mississippi Power & Light v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985).

### A. The Tribe's Standing as Parens Patriae

The Tribe claims that it has standing to assert the claims of its members who are affected by the hair length restriction under the doctrine of *parens patriae.* It is evident that the Tribe has an interest in the preservation of its Native American heritage, culture, and religion, and in encouraging its members, especially its young people, to observe and participate in its sacred ceremonies. The doctrine of *parens patriae* allows a sovereign to bring an action on behalf of the interest of all of its citizens. *Louisiana v. Texas,* 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900). It has been used to allow states to recover damages to quasi-sovereign interests, such as the health, safety and welfare of the people, pollution-free interstate waters and air, and the general economy of the state. *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1089 (2nd Cir.1971), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). However, a sovereign tribe must be acting on behalf of *all* of its members in order to litigate as *parens patriae. Kickapoo Tribe of Oklahoma v. Lujan,* 728 F.Supp. 791, 795 (D.D.C.1990); *Assiniboine & Sioux Tribes v. Montana,* 568 F.Supp. 269, 277 (D.Mont.1983).

While the application of the hair restriction may in some way affect members of the Tribe other than the Native American students at Big Sandy and their families, the Tribe is not representing the interests of all its members in this case, as the doctrine of *parens patriae* requires. Therefore, the Tribe may not bring this action as *parens patriae* of its members. The Tribe's interest in promoting its children's appreciation for tribal heritage and religion will be discussed, however, in connection with the interest of the Tribe and parents in their children's upbringing.

### B. Constitutional Rights of Native American Students

Plaintiffs assert that the First Amendment free exercise of religion and free speech

**1328**

clauses, and the Fourteenth Amendment due process and equal protection clauses, are implicated by the dress code, which prohibits male students from wearing their hair long.

1. The Right to Wear Long Hair

The Bill of Rights protects the fundamental rights of citizens "against the State itself and all of its creatures—Boards of Education not excepted." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). Although school boards perform "important, delicate, and highly discretionary functions," these functions must be performed "within the limits of the Bill of Rights." *Id.*

In *Karr v. Schmidt,* 460 F.2d 609 (5th Cir.), *cert. denied,* 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972), the United States Court of Appeals for the Fifth Circuit held that there is no constitutionally protected right to wear one's hair in a public high school in the length and style that suits the wearer. Nonetheless, the court recognized that:

> Federal courts ... have unflinchingly intervened in the management of local school affairs where fundamental liberties, such as the right to equal education, required vindication ... [But] [s]tate regulations which do not affect fundamental freedoms are subject to a much less rigorous standard of judicial review than is applicable when such fundamental rights are at stake.

*Karr,* 460 F.2d at 616.

■ The Fifth Circuit held that the hair length restriction did not violate the students' First Amendment right to free speech, nor did it discriminate against male students in violation of the Fourteenth Amendment equal protection clause. *Id.* Since no fundamental right was implicated, the court applied the deferential "rational basis" standard, and found that the hair regulation was reasonably intended to accomplish constitutionally permissible state objectives: eliminating classroom distraction; avoiding violence among students; and eliminating potential health and safety hazards. *Id.* at 617. *See also New Rider v. Board of Educ. of Ind. School Dist. No. 1, Okl.,* 480 F.2d 693 (10th Cir.), *cert. denied,* 414 U.S. 1097, 94 S.Ct.

733, 38 L.Ed.2d 556 (1973) (where students failed to establish that a fundamental right had been violated, court applied rational basis test and upheld school's hair regulations). The Fifth Circuit announced a *per se* rule in *Karr*—school dress codes are valid *as long as they do not affect fundamental freedoms.* 460 F.2d at 616.

2. Free Exercise of Religion

Unlike the plaintiff in *Karr,* plaintiffs in the present action have alleged that the Board's hair regulation infringes upon several fundamental rights, including the free exercise of religion, and undermines the right of parents and the Tribe to direct the religious upbringing of their children. Plaintiffs also allege that the regulation adversely affects the right of parents and the Tribe to encourage respect for Native American heritage, a heritage which is inextricably intertwined with the students' religious beliefs.

a. *Sincerity of Students' Belief*

■ To establish that a state regulation violates the First Amendment free exercise clause, the claimants must show that they have a sincerely held religious belief which conflicts with and is burdened by the regulation. Laurence H. Tribe, *American Constitutional Law* § 14–12, at 1242 (2d ed. 1988).

■ The factfinder, whether the court or a jury, may determine whether a claimant's religious belief is sincerely held; however, the factfinder may not delve into the question of religious verity, or the reasonableness of the belief. *United States v. Ballard,* 322 U.S. 78, 86–87, 64 S.Ct. 882, 886–87, 88 L.Ed. 1148 (1944). *See Teterud v. Burns,* 522 F.2d 357 (8th Cir.1975) (Native American inmate allowed to wear long braided hair in the penitentiary in accordance with his sincerely held religious beliefs). Further, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Board,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981); *Society of Separationists v. Herman,* 939 F.2d 1207, 1215 (5th Cir.1991). *See also Hobbie v. Unemployment Appeals Commission,* 480

U.S. 136, 144, 107 S.Ct. 1046, 1050, 94 L.Ed.2d 190 (1987) (sincere religious beliefs, although recently acquired, are fully protected).

Whether the court finds that the plaintiffs' belief is reasonable is of no consequence:

> [T]here is no requirement that a religion meet any organizational or doctrinal test to qualify for First Amendment protection. Further, orthodoxy is not an issue in determining whether religion qualifies for First Amendment protection.

*Gallahan v. Hollyfield,* 516 F.Supp. 1004, 1006 (E.D.Va.1981), *aff'd,* 670 F.2d 1345 (4th Cir.1982) (citations omitted). *See also Wisconsin v. Yoder,* 406 U.S. 205, 216–18, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15 (1972).

Thus, the definition of a "religion" which is entitled to First Amendment protection must not be limited to concepts embodied in traditional religions. Orthodox religions of the world generally have certain characteristics in common, such as a belief in the existence of a Supreme Deity, and a goal or purpose for human existence. *Smith v. Board of School Com'rs of Mobile County,* 655 F.Supp. 939, 979 (S.D.Ala.), *rev'd on other grounds,* 827 F.2d 684 (11th Cir.1987). The existence of these characteristics may guide the court's determination of whether the belief in question is religious. However, the inquiry should not come to an end if traditional characteristics are not present. Whenever a belief system encompasses fundamental questions of the nature of reality and relationship of human beings to reality, it deals with essentially religious questions. *Id.* at 979 (determining that secular humanism is a religious belief system entitled to the protections of the religion clause).

The Native American Indian movement, while it may seem rather nebulous and unstructured to persons versed in more traditional religions, such as Christianity, Judaism, Hinduism, or Islam, is certainly a religion, as is apodictically shown by its system of beliefs concerning the relationship of human beings and their bodies to nature and reality. It is, therefore, entitled to First Amendment protection.

Even if the wearing of long hair is not a fundamental tenet of Native American religious orthodoxy, "[p]roof that the practice is deeply rooted in religious belief is sufficient." *Teterud v. Burns,* 522 F.2d 357, 360 (8th Cir.1975). Moreover, although the practice may also be "a matter of tradition, the wearing of long hair for religious reasons is a practice protected from government regulation by the Free Exercise Clause." *Id. See also Braxton v. Board of Public Instruction of Duval Co., Fla.,* 303 F.Supp. 958, 959 (M.D.Fla.1969) (where a goatee is worn by an African American teacher as an expression of his heritage, culture, and racial pride, the teacher enjoys the protection of the First and Fourteenth Amendments).

*Teterud* involved a Native American prisoner's challenge to prison hair length regulations. The Eighth Circuit found that the plaintiff's desire to wear his hair long and braided went beyond purely secular considerations of racial pride and personal preference. *Teterud,* 522 F.2d at 359. The court cited the testimony of a social anthropologist, Professor Thomas, himself a member of a Cherokee tribe, at some length:

> I think the older Cree would say that when God created the Cree he gave him long hair and that is, you know, that is as it should be . . . You see, that is in the nature of the world that the Cree has long hair. Now, to not have long hair is unnatural for a Cree. So that for those Crees who I think are, you know, like the kind [who] put theirself into their religion, they will tend to grow their hair long.

*Id.* at 359 n. 4.

Another anthropologist, Professor Holder, explained that, as hair is considered to be a body part, a Native American considers it a gift from nature, or a link with the universe, which has always been considered to be sacred. *Id.* at 360 n. 5.

The opinion of the Eighth Circuit in *Teterud* is persuasive. The court found that the Native American inmate had a sincere religious belief in wearing long hair, even though his belief did not conform to orthodox opinions and beliefs. *Id.* at 361. Similarly, in *Gallahan,* 516 F.Supp. at 1006, the court found that the Cherokee inmate had a sin-

cere religious belief, even though he had only worn his hair long for a few years, and even though the inmate admitted that there were no written creeds requiring long hair established by his forefathers or family. *See also Sequoyah v. Tennessee Valley Authority*, 620 F.2d 1159, 1163 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980) (the fact that Cherokees have no written creeds or houses of worship are of little import when construing the individual beliefs of the plaintiff's religion). In *Gallahan*, the court rejected the state's argument that the inmate had merely adopted these beliefs as a convenient method of maintaining a certain hairstyle. 516 F.Supp. at 1006.

Furthermore, consistent with the testimony of Dr. Gregory in the present case, the Eighth Circuit recognized that "the Indian religion, unlike Christian religions, is not exclusive. Its followers can, without contradiction, participate in different religions simultaneously." *Teterud*, 522 F.2d at 361. Thus, the fact that several of the students in the present case practice the Christian religion, while maintaining Native American religious beliefs and practices, does not undermine their claim that long hair constitutes a sincerely held religious belief.

Moreover, the fact that some members of the Tribe do not object to cutting their hair does not defeat the plaintiffs' claim. The court must consider the sincerity of the plaintiffs' own religious belief, not anyone else's. *See Moskowitz v. Wilkinson*, 432 F.Supp. 947, 949 (D.Conn.1977).

Finally, plaintiffs are not stripped of their right to free exercise of their own religious beliefs simply because wearing one's hair long is not absolutely mandated by the Tribe or its religious or cultural leaders. *Moskowitz*, 432 F.Supp. at 949; *Gallahan*, 516 F.Supp. at 1006.

b. *The School's Interest in Regulating Hair Length*

Once plaintiffs have proven the sincerity of their religious belief, the burden then shifts to the state or governmental agency to show that the regulation advances an unusually important governmental goal, and that an exemption would substantially hinder the fulfillment of that goal. *See Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).

While freedom to believe in a particular religious creed or doctrine is absolute, freedom to act pursuant to one's religion is not. "Conduct remains subject to regulations for the protection of society." *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). In cases which do not involve challenges to the state's compelling interest in regulating and protecting the public health and safety through its criminal statutes, the state may only employ the least restrictive means of regulating conduct which is a religious practice or belief. *See Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 1792–93, 10 L.Ed.2d 965 (1963); *Yoder*, 406 U.S. at 233, 92 S.Ct. at 1542. *Cf. Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (rejecting the "least restrictive means" test with regard to a challenge to a criminal statute which was facially nondiscriminatory and neutrally applied).

It is unclear, after *Smith*, whether a valid free exercise claim in a civil context, unaccompanied by other constitutional claims, would be entitled to the intense scrutiny necessitated by the least restrictive means, or compelling state interest, standard. *See Smith*, 494 U.S. at 884, 110 S.Ct. at 1603 (whether or not the *Sherbert* compelling state interest analysis applies "beyond the unemployment compensation field, we would not apply it to require exemptions from a generally applicable *criminal* law") (emphasis added).

Several circuits, focusing on dicta in the *Smith* opinion, have held that free-standing free exercise claims, whether in a civil or criminal context, are now subject to only a rational basis review. *See Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir.1991) (applying *Smith* rational basis test, without analysis, to neutral zoning ordinance); *Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927 (6th Cir.1991) (upholding equivalency examination requirement for home study credit); *Salvation Army v. N.J.*

*Dept. of Community Affairs,* 919 F.2d 183 (3rd Cir.1990) (finding state's neutral boarding house regulations valid); *St. Bartholomew's Church v. City of New York,* 914 F.2d 348 (2nd Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 214 (1991) (upholding New York City's Landmarks Law). *See also Yang v. Sturner,* 750 F.Supp. 558 (D.R.I.1990) (rejecting Hmong couple's challenge to state's neutrally applicable law governing autopsies).

Other circuits have expressly limited *Smith's* application to laws which punish *criminal* conduct. *See American Friends Service Committee Corp. v. Thornburgh,* 961 F.2d 1405 (9th Cir.1991); *N.L.R.B. v. Hanna Boys Center,* 940 F.2d 1295 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). *See also United States v. Boyll,* 774 F.Supp. 1333 (D.N.M. 1991); *Church of Scientology v. City of Clearwater,* 756 F.Supp. 1498, 1514 (M.D.Fla. 1991). These cases more closely follow established Supreme Court precedent. "However free the exercise of religion may be, [it has always been] subordinate to the criminal laws of the country...." *Davis v. Beason,* 133 U.S. 333, 342–43, 10 S.Ct. 299, 300–301, 33 L.Ed. 637 (1890).

Although an array of free exercise challenges have been brought before the Fifth Circuit in the aftermath of *Smith,* the court has not yet had occasion to determine the breadth of *Smith's* applicability. *See Murray v. City of Austin, Tex.,* 947 F.2d 147, 152 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992) (presence of the cross in the city of Austin's insignia does not violate the religion clauses); *Society of Separationists, Inc. v. Herman,* 939 F.2d 1207, 1215–17 (5th Cir.1991) (judge's attempt to coerce a prospective juror to make an affirmation in spite of her sincere religious objections, an infringement of both free speech and free exercise of religion, violated the First Amendment); *United States v. Allibhai,* 939 F.2d 244, 249–50 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992) (rejecting

Muslims' argument that they were impermissibly targeted in a criminal investigation, and referring to *Smith* for guidance regarding the "interplay between the First Amendment and the enforcement of criminal laws"); *Munn v. Algee,* 924 F.2d 568, 574 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 277, 116 L.Ed.2d 229 (1991) (without determining the applicable standard (rational basis or compelling state interest), holding that a free exercise claim did not excuse a Jehovah's witness from failing to mitigate damages); *Peyote Way Church of God, Inc. v. Thornburgh,* 922 F.2d 1210, 1213, 1220 (5th Cir.1991) (discussing *Smith* as eviscerating judicial scrutiny of free exercise challenges to generally applicable criminal prohibitions). Thus, there is no clear precedent in the Fifth Circuit with regard to the level of scrutiny to be applied to independent free exercise challenges to generally applicable, noncriminal, regulations.

The holding in *Smith* arose in a very discrete context, where the Court determined that the state's interest in regulating criminal conduct, thereby protecting the public health, safety, and welfare, was so overwhelming that a free exercise challenge, standing alone, could not be maintained. *See Smith,* 494 U.S. at 884–85, 110 S.Ct. at 1603. *See also Church of Scientology,* 756 F.Supp. at 1513 ("[a]lthough the state cannot punish religious views and beliefs, the state [through the exercise of its police powers] can punish the external manifestation of those views if the resulting conduct is a clear and present danger to the safety, morals, health or general welfare of the community and is violative of laws enacted for their protection").[3]

A finding that *Smith* is generally applicable to every free exercise challenge, whether in the civil or criminal context, would be a gross aberration from decades of established Supreme Court precedent in the First Amendment arena. *See Bowen v. Roy,* 476 U.S. 693, 728, 106 S.Ct. 2147, 2167, 90 L.Ed.2d 735 (1986) (O'Connor, J., concurring in part and dissenting in part); *United*

---

**3.** It has been suggested that the *Smith* opinion was merely an overreaction to the nation's current political agenda—the war on drugs. *See*

*Smith,* 494 U.S. at 908, 110 S.Ct. at 1616 (Blackmun, J., dissenting).

*States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Board,* 450 U.S. 707, 719, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Yoder,* 406 U.S. at 221, 92 S.Ct. at 1536; *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Sherbert v. Verner,* 374 U.S. 398, 402–02, 83 S.Ct. 1790, 1792–93, 10 L.Ed.2d 965 (1963).[4] Moreover, it would represent the erosion, if not the absolute obliteration, of one of the most basic principles our Founders, recently freed from the oppression of European government, sought to establish through the Bill of Rights—the free exercise of religion as a fundamental right of the new American democracy.[5]

In any event, the present case does not require a resolution of whether *Smith* applies to neutral civil laws, such as the Big Sandy hair regulation, which allegedly burden free-standing free exercise interests, as plaintiffs have alleged a hybrid claim of free exercise, free speech, due process, and equal protection rights.

■ When some other constitutional right is combined with a free exercise claim in a so-called "hybrid claim," the state must demonstrate more than merely a reasonable relation to a valid, secular state purpose to sustain the validity of the regulation over First Amendment concerns. *Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542; *Smith,* 494 U.S. at 881, 110 S.Ct. at 1601. Where either parental interests or free speech are asserted in conjunction with a free exercise claim, something more than a mere "reasonable relation to some purpose within the competency of the State is required to sustain the validity of the State's requirement under the First Amendment." *Smith,* 494 U.S. at 881 n. 1, 110 S.Ct. at 882 n. 1 (citing *Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542). *See Herman,* 939 F.2d at 1216 (Fifth Circuit applied strict scrutiny to religion-plus-speech claim).

The prison cases, while not controlling in the context of public schools, are instructive on the issue of whether the hair regulation bears more than a "reasonable relation" to the school's stated purpose for the dress code.[6] In *Teterud,* the Eighth Circuit, affirming the district court, found that a prison hair regulation was overbroad and violative of the Native American inmate's free exercise rights. 522 F.2d at 360–61. Other circuits have followed suit, and have stricken prison hair regulations as violative of inmates' First Amendment rights. *See, e.g., Gallahan v. Hollyfield,* 516 F.Supp. 1004 (E.D.Va.1981), *aff'd,* 670 F.2d 1345 (4th Cir. 1982) (Cherokee inmate successfully challenged regulation which prohibited long hair); *Moskowitz v. Wilkinson,* 432 F.Supp. 947 (D.Conn.1977) (prison ban on wearing of beards is unconstitutional as applied to prisoners, such as plaintiff, an Orthodox Jew,

---

**4.** As Justice Blackmun stated in dissent, the *Smith* decision "effectuates a wholesale overturning of settled law concerning the Religion Clauses of our Constitution." 494 U.S. at 908, 110 S.Ct. at 1616 (Blackmun, J., dissenting). Justice O'Connor agreed that the majority gave "a strained reading of the First Amendment ... [and] disregard[ed] our consistent application of free exercise doctrine to cases involving generally applicable regulations that burden religious conduct." *Id.* at 892, 110 S.Ct. at 1607 (O'Connor, J., concurring in the judgment).

**5.** The dissent in *Smith* accused the majority of distorting longstanding precedent to reach its conclusion that "strict scrutiny of a state law burdening the free exercise of religion is a 'luxury' that a well-ordered society cannot afford, and that the repression of minority religions is an 'unavoidable consequence of democratic government.'" *Smith,* 494 U.S. at 908–09, 110 S.Ct. at 1616 (Blackmun, J., dissenting). Justice Blackmun continued:

I do not believe the Founders thought their dearly bought freedom from religious persecution a 'luxury,' but an essential element of liberty—and they could not have thought religious intolerance 'unavoidable,' for they drafted the Religion Clauses precisely in order to avoid that intolerance.
*Id.* at 909, 110 S.Ct. at 1616.

**6.** Because of the "reality of incarceration and the inherent conflict with various legitimate penological objectives," especially the interest in security, the United States Supreme Court has held that the constitutional rights of prisoners are "considerably more circumscribed than those of the general public." *Powell v. Estelle,* 959 F.2d 22, 23 (5th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 668, 121 L.Ed.2d 592 (1992) (citing *Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804–05, 41 L.Ed.2d 495 (1974) and *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)).

who wear beards for religious purposes).[7]

Undoubtedly, a prison is a much more restrictive environment than are public schools. *See Powell,* 959 F.2d at 23. Surely, prison wardens have a far greater interest in regulating the dress and grooming of inmates than do principals and school boards in regulating that of junior high and high school students. The courts have recognized that, in the prison context, there may be some potential for inmates to hide weapons or drugs in their long hair. *Gallahan,* 516 F.Supp. at 1006. Further, long hair could obscure facial identification and, if not kept clean, cause sanitary problems. *Id.* Nonetheless, both courts determined that the state interest in prison security and sanitation did not justify the burdensome restriction on sincere religious beliefs. *Id.*; *Teterud,* 522 F.2d at 361. The courts noted that there are certainly less restrictive means of achieving these valid prison objectives than the hair length regulation in question. *Gallahan,* 516 F.Supp. at 1007; *Teterud,* 522 F.2d at 361.

Similarly, several circuits have held that, although the establishment of a dress code is a proper function of a school board, an exemption to school dress codes is necessary where the regulations unduly burden the sincerely held religious beliefs of students. *See Menora v. Illinois High School Ass'n,* 683 F.2d 1030 (7th Cir.1982), *cert. denied,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983); *Hatch v. Goerke,* 502 F.2d 1189 (10th Cir.1974). The fact that the dress code applies uniformly to all students does not save the regulation. "A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Yoder,* 406 U.S. at 220, 92 S.Ct. at 1536.

■ The Trustees have failed to show that the restriction on hair length is a valid means of achieving its objectives of maintaining discipline, fostering respect for authority, and projecting a good public image. As

there is a complete lack of evidence on less restrictive, alternative means of achieving these goals, the court will not engage in speculation as to what those alternatives may be. However, several courts have found viable alternatives to hair length restrictions in prison cases, which would not be unduly burdensome to a sincerely held religious belief in wearing long hair. *See Teterud,* 522 F.2d at 361. Surely, school officials can likewise implement alternatives which pass constitutional muster.

### 3. Free Speech

Plaintiffs assert that a number of other constitutional rights are affected by the hair length restriction. First, they claim that to wear one's hair long is an expressive or communicative activity to a Native American, especially with regard to the performance of ceremonial dances, and that, as such, it is protected by the First Amendment free speech clause. The Fifth Circuit rejected a similar argument in *Karr,* 460 F.2d 609. However, the plaintiffs in *Karr* did not state any facts to support a claim that the wearing of long hair is a form of expressive activity. In contrast, the testimony of tribal members and the expert testimony of the anthropologist, Dr. Gregory, was compelling evidence that long hair in Native American culture and tradition is rife with symbolic meaning.

■ Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (citing *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)). They cannot be punished merely for expressing their personal views on the school premises unless school authorities have reason to believe that such expression will "substantially interfere with the work of the school or impinge upon the rights of other students." *Tinker,* 393 U.S. at 509, 89 S.Ct. at 738.

---

**7.** Although prisoners' constitutional claims are no longer afforded heightened scrutiny, *see O'Lone v. Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987), the cases cited above are helpful to the "least restrictive means" analysis which must be applied in the present case.

In *Tinker*, the Supreme Court held that students could not be prohibited from wearing black armbands in protest of American involvement in Vietnam, when the armbands did not cause disruption of school discipline or decorum. 393 U.S. at 505, 89 S.Ct. at 735. The expressive activity at issue in *Tinker* was considered "closely akin to pure speech" protected by the First Amendment. *Id.* at 505–06, 89 S.Ct. at 736. *See also West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (under the First Amendment, students may not be compelled to salute the flag).

While a few teachers and teachers' aides testified that there had been an overall increase in disciplinary problems at Big Sandy Independent School District since the entry of the temporary restraining order in this case, none could establish any connection whatsoever between the wearing of long hair and the perceived problems. Anticipation of disruption due to the wearing of long hair does not justify the curtailment of the students' silent, passive expression of their faith and heritage.

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk ...; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 508–09, 89 S.Ct. at 737–38 (citations omitted). *See Butts v. Dallas Independent School District*, 436 F.2d 728 (5th Cir.1971) (wearing black armbands is not the equivalent of "fighting words," and, absent a definite showing of disruption in the classroom, students may not be prohibited

from exercising their First Amendment rights in this manner).

Like the armbands, the wearing of long hair by Native American students is a protected expressive activity, which does not unduly disrupt the educational process or interfere with the rights of other students. As such, the regulation, as applied to these students, violates the First Amendment free speech clause.

4. Right of Parents to Direct Their Children's Upbringing

■ Plaintiffs also allege that the free exercise claim is made in conjunction with the right of the parents and the Tribe to raise and educate their children, to guide their children's religious beliefs, and to instill respect in the young members of the Tribe for their Native American heritage. As discussed above, the right of parents to participate and direct their children's education and religious upbringing is firmly established in constitutional doctrine. *Yoder*, 406 U.S. 205, 92 S.Ct. 1526; *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

Several parents testified that they were active in the Christian faith, and that they did not require their children to wear their hair long. However, parents and other tribal members fully supported their children's decision to wear long hair as a spiritual and expressive symbol of Native American religion and tradition. The Supreme Court has not required unanimity of religious beliefs between parent in child. In *Yoder*, the Court recognized that such "intrusion ... into family decisions in the area of religious training would give rise to grave questions of religious freedom ..." and that the holding in the case "in no way determines the proper resolution of possible competing interests of parents, children, and the State." 406 U.S. at 231–232, 92 S.Ct. at 1541.

Plaintiffs have stated a valid constitutional claim that the hair regulation unduly burdens the parental right to guide their children's education and upbringing.

### 5. Due Process

#### a. *Procedural Due Process*

██ Plaintiffs also claim that the in-house detention of the Native American students violated the procedural due process guarantees of the Fourteenth Amendment. Students have a legitimate claim of entitlement to public school education. *Goss v. Lopez,* 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975). The suspension of a student implicates that student's right to be free from any deprivation of liberty and property without due process of law. *Id.*

It is firmly established in the Fifth Circuit that students must be afforded notice and a right to be heard before they may be suspended from school for a lengthy or indefinite period of time. *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir.), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). *See Goss,* 419 U.S. at 582–83, 95 S.Ct. at 740–41. Absent some extraordinary situation requiring immediate action before a hearing, students are entitled to an opportunity to appear and argue for leniency or special consideration. *Hatch v. Goerke,* 502 F.2d 1189, 1195 (10th Cir.1974).

██ Several of the plaintiffs were suspended for over a month before they were allowed to return to regular classes pursuant to the court's temporary restraining order. There was no evidence that the plaintiffs were given adequate notice and a right to be heard. While Superintendent Foster testified that the normal procedure was to send a three day written notice home with the student prior to any suspension, Foster did not know whether that procedure had been followed with regard to any of the plaintiffs. There was no documentary proof that any notice was given. Further, Waynne Williams testified that her children were told on the first day of the fall term that if they did not have their hair cut before the next day, they would not be allowed to return to school. She did not recall receiving any notice or opportunity to discuss the application of the dress code with school officials.

Foster testified that the students or parents could appeal the suspension to the superintendent and the school board, but admitted that the availability of review by the school board was not set down in writing. There was no evidence that either the children's parents or the Tribe were notified of the right to appeal the suspensions to the school board. The procedure given these students, or lack thereof, falls short of that required by the due process clause of the Fourteenth Amendment.

#### b. *Substantive Due Process*

Plaintiffs also allege a violation of their substantive due process rights. They claim that the punishment, in-school suspension, was disproportionate to the perceived offense, the wearing of long hair, and that the dress code had no rational basis in instructional, pedagogical, or disciplinary theory.

To constitute a violation of substantive due process, the school officials' action must have been based on unconstitutional criteria, or have been arbitrary and capricious. *See Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Amelunxen v. Univ. of Puerto Rico,* 637 F.Supp. 426 (D.P.R.1986), *aff'd,* 815 F.2d 691 (1st Cir.1987). If the decision to suspend the students was not made in bad faith, and the procedures applied were not unfair, the suspensions will stand unless they are "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Amelunxen,* 637 F.Supp. at 431 (citing *Ewing,* 474 U.S. at 225, 106 S.Ct. at 513). Thus, if the suspensions were patently unreasonable or disproportionate to the offense, the plaintiffs would be entitled to relief. *Cunningham v. Beavers,* 858 F.2d 269 (5th Cir.1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1343, 103 L.Ed.2d 812 (1989).

██ Although the hair regulation does not satisfy the heightened scrutiny applied under First Amendment analysis, it is rationally related to the legitimate goals of creating an atmosphere conducive to learning and to minimize disruptions attributable to personal appearance; fostering an attitude of respect for authority; and preparing students to enter the workplace. *See Karr v. Schmidt,* 460

F.2d 609 (5th Cir.1972). In-school suspension for a period of a month to six weeks, which afforded the students at least some opportunity to pursue their regular coursework and receive assistance from teachers and teachers' aides, is not an unreasonable punishment. While in-school suspension, imposed to punish relatively innocuous infringements of the school dress code, may indeed constitute a substantive due process violation when it extends for a longer period of time, resulting in a marked learning disadvantage for suspended students, the suspensions which took place in the present case do not.

6. Equal Protection

Finally, plaintiffs allege that the application of the dress code to Native American students violates the Fourteenth Amendment's guaranty of equal protection. They claim that the suspension of the students arbitrarily denied them of educational benefits on account of their race.

■ The Fourteenth Amendment mandates similar treatment under the law for those who are similarly situated. *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1214 (5th Cir.1991); *Cunningham v. Beavers*, 858 F.2d 269, 272 (5th Cir.1988). The Big Sandy dress code is a racially neutral law, which singles out no particular group or individual. When a neutral law has a disproportionately adverse effect upon a racial minority, it violates the equal protection clause if the disproportionate impact can be traced to a discriminatory purpose, which "implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir.1992).

The record is devoid of any evidence that the hair regulation was promulgated for a discriminatory purpose, or that school officials had a discriminatory motive in the enforcement of the regulation. Instead, the defendants have stated reasonable, nondiscriminatory reasons for the dress code, including the maintenance of discipline and promotion of respect for authority. The

plaintiffs have not disputed the validity of the goals underlying the dress code.

■ An equal protection claim will be reviewed under the rational basis test when there is no evidence of discriminatory purpose underlying a racially neutral regulation. *Cunningham*, 858 F.2d at 273. "If evaluation of the challenged regulation reveals any conceivable state purpose that can be considered as served by the legislation, then it must be upheld." *Id.*

> Certainly, maintenance of discipline and order in public schools is a prerequisite to establishing the most effective learning atmosphere and as such is a proper object for state and school board regulation.

*Id.* (citing *Ingraham v. Wright*, 525 F.2d 909, 916–917 (5th Cir.1976) (en banc), *aff'd*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). The hair regulation advances a legitimate purpose, and it survives plaintiffs' equal protection challenge. *See Hatch v. Goerke*, 502 F.2d 1189, 1192 (10th Cir.1974).

C. *Preliminary Injunction*

■ The plaintiffs are entitled to a preliminary injunction, since they have satisfied the elements established in *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir.1985). As discussed above, there is a substantial likelihood of success on the merits of the First Amendment claims and the Fourteenth Amendment procedural due process claim.

The injuries threatened if the conduct is not enjoined will be irreparable and irrevocable. Plaintiffs have made an adequate showing that they are given inferior instruction while in in-house detention. Students in detention are given their daily assignments and are monitored by a teacher's aide. However, the students, in actuality, are given very little opportunity to question their teachers about the assignments, and they receive only minimal assistance or tutorial help while in detention. The plaintiffs allege that, prior to the issuance of the restraining order, the students were falling behind in their studies. If they were removed from their regular classes and returned to detention, they may never attain the educational level enjoyed by other students. If the defendants were not en-

joined, the Native American students would be placed in the deplorable position of choosing between the free exercise of their religious beliefs and obtaining an adequate education.

The threatened injuries far outweigh any real harm to defendants. Although the defendants have alleged that there has been an increase in disciplinary problems since the issuance of the temporary restraining order, there has been no showing that the alleged increase is the result of the wearing of long hair. Further, the alleged problems appear to be insubstantial in comparison to the potential injury to the plaintiffs if the defendants' conduct were not enjoined.

Finally, the granting of preliminary injunctive relief is in the public interest, as it promotes tolerance for diverse viewpoints, and fosters understanding and sensitivity towards Native American students, and, indeed, toward all students who have beliefs which fall outside of our society's mainstream, ethnocentric belief system.

D. *Qualified Immunity*

The individual defendants assert that they are entitled to qualified official immunity from plaintiffs' claims for damages. State officials enjoy qualified immunity unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Savidge v. Fincannon,* 836 F.2d 898, 907 (5th Cir.1988) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). School officials are charged with knowledge of the basic constitutional rights of the students, and are immune only if they held a reasonable belief at the time of the conduct in question that there was a lawful right to act as they did. *Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1465 (9th Cir.1984) (citing *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)). This is not to say that school officials are "charged with predicting the future course of constitutional law." *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). A compensatory award will be appropriate only if the school official has acted with "such disregard of the

student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." *Bilbrey,* 738 F.2d at 1465.

In light of *Karr v. Schmidt,* 460 F.2d 609, which established that school dress codes are not subject to attack by students absent allegations of infringement on a fundamental right such as religion, and *Smith,* 494 U.S. 872, 110 S.Ct. 1595, which muddied the waters of the First Amendment free exercise doctrine, it cannot be said that a competent school official knew or should have known that the Big Sandy dress code was unconstitutional as applied to Native American students. Thus, the defendants, in their respective individual capacities, are entitled to qualified immunity with regard to the First Amendment claims.

Further, the defendants did not violate a clearly established constitutional right of which a reasonable person would have known with regard to plaintiffs' procedural due process claim. The Trustees, Superintendent Foster, and Principal Fountain reasonably believed that students and their parents were aware of the provisions of the school dress code, which had been in place for nearly twenty-five years. They also reasonably believed that some sort of notice had been given to the students and their parents prior to any lengthy suspension. Parents and tribal council members met with the Board on two occasions in September to discuss the hair length regulation, and, after concerned individuals were allowed to speak on the issue, the Board voted to retain the regulation. Accordingly, the school officials, in their individual capacities, are immune from plaintiffs' claim for monetary damages resulting from the due process violation.

E. *Attorney's Fees*

Plaintiffs are seeking interim attorney's fees under 42 U.S.C. § 1988. Attorney's fees are available to parties who prevail in First Amendment actions. *Iranian Students Ass'n v. Sawyer,* 639 F.2d 1160 (5th Cir.1981). Although plaintiffs' claim for damages pursuant to 42 U.S.C. § 1983 was unsuccessful, the entry of the preliminary injunction results in a material alteration of

**1338**

the legal relationship between the plaintiffs and the Trustees of Big Sandy, the superintendent, and the principal. *See Texas State Teachers Ass'n v. Garland Ind. School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). Thus, plaintiffs are prevailing parties for the purposes of an award of fees under § 1988, where they have successfully vindicated their First and Fourteenth Amendment rights and altered school policy. *Id. See also Wyatt v. Cole*, 928 F.2d 718, 722 (5th Cir.1991), *rev'd on other grounds*, —— U.S. ——, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992); *Jackson v. Galan*, 868 F.2d 165, 168–69 (5th Cir.1989); *Haskell v. Washington Tp.*, 864 F.2d 1266, 1279 (6th Cir.1988). However, where injunctive relief is ordered, the award of attorney's fees will generally be imposed solely against the defendants in their official capacities, since the injunctive relief sought and won by the plaintiffs can only be obtained from the defendants acting in their official capacities. *Scott v. Flowers*, 910 F.2d 201, 213 n. 25 (5th Cir.1990).

 Plaintiffs seek fees incurred in the pursuit of this preliminary injunction. An award of interim attorney's fees is proper where the liability of the opposing party has been established, and the substantial rights of the parties have been determined. *Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980); *Haskell*, 864 F.2d at 1279. *See Frazier v. Board of Trustees*, 765 F.2d 1278 (5th Cir. 1985), *amended*, 777 F.2d 329 (5th Cir.1985); *Espino v. Besteiro*, 708 F.2d 1002 (5th Cir. 1983). Plaintiffs have satisfied this standard.

Plaintiffs will be allowed to file their properly documented and detailed petition for reasonable attorney's fees within twenty days of the service of this order.

### III. *Conclusion*

For the reasons set forth above, the plaintiffs are entitled to a preliminary injunction enjoining the defendants from enforcing the Big Sandy Independent School District's hair regulation against Native American students. An order incorporating the terms set forth

above shall issue concurrently with this memorandum opinion.