Leela P. MILLER, Plaintiff,

v.

BAY VIEW UNITED METHODIST CHURCH, INC., A Wisconsin non-profit corporation, Defendant.

No. 99–C–0676.

United States District Court, E.D. Wisconsin.

March 31, 2001.

Paul D. Lawent, Alan D. Eisenberg, Attorneys at Law, Law Offices of Alan D. Eisenberg, Milwaukee, WI, for Plaintiff.

Michael J. Cohen, William T. Stuart, Attorneys at Law, Meissner Tierney Fisher & Nichols, Milwaukee, WI, for Defendant.

### MEMORANDUM AND ORDER

GORENCE, United States Magistrate Judge.

On June 17, 1999, the plaintiff, Leela P. Miller, an African–American woman, filed this action against Bay View United Methodist Church (Bay View Church) alleging racial discrimination. The plaintiff alleges that the defendant terminated her employment as Bay View Church's Music Director and Choir Director because of her race in violation of Title VII of the Civil Rights Acts of 1964, 42 U.S.C.A. § 2000e, as amended. The plaintiff seeks lost wages and other compensation.

The court has potential jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 13.03 (E.D.Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Local Rule 13.05(a) (E.D.Wis.).[1]

Defendant Bay View Church has filed a motion to dismiss the action for lack of subject matter jurisdiction under the Free Exercise Clause and the Establishment Clause of the First Amendment. In opposition to the motion, the plaintiff contends that the defendant's termination of her employment is not exempted from the provisions of Title VII, nor is it exempted from review by the court under the First Amendment. The plaintiff contends that her position at defendant Bay View Church was not ecclesiastical or ministerial in nature so as to preclude the court's subject matter jurisdiction over the action.

At the outset, the court notes that in its motion to dismiss for lack of subject matter jurisdiction, the defendant cites Rules 12(h)(3) and 56 of the Federal Rules of Civil Procedure and Local Rule 6 (E.D.Wis.). Rule 12(h)(3) of the Federal Rule of Civil Procedure state "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

However, a Rule 56 motion for summary judgment is not an appropriate method for challenging subject matter jurisdiction. *See* 5A Charles Alan Wright & Arthur R.

Miller, *Federal Practice and Procedure* Civil 2d § 1350 at 206–209 (1990); *Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir.1987). "Whereas a grant of summary judgment is a decision on the merits, *see Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir.1987), a court must dismiss the case without ever reaching the merits if it concludes that it has no jurisdiction." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188 (7th Cir.1993) (citing *Shockley v. Jones*, 823 F.2d 1068, 1070 n. 1 [7th Cir. 1987]); *see generally, Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1130–1131 (2nd Cir.1976) (discussing relationship between Rules 12[b][1] and 56).

 It is well established that the "district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co.*, 999 F.2d at 191 (quoting *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 [7th Cir.1979]). Thus, the court will consider the affidavits and other evidentiary materials submitted by the parties in conjunction with the instant motion. Furthermore, the court notes that it must accept all well-pleaded factual allegations as true and draw reasonable inferences in favor of the plaintiff. *See Capitol Leasing Co.*, 999 F.2d at 191 (regarding motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12[b][1]).

In light of the foregoing, the defendant's motion will not be treated as a motion for summary judgment. Rather, the court will treat the defendant's motion as a mo-

---

1. New local rules came into effect on February 1, 2001, which govern both civil and criminal litigation in this district. *See* www.wied.uscourts.gov. However, the case was assigned under the prior rules. The pending motions were also briefed under those rules. Thus, the prior Local Rules will be applied in this decision.

tion to dismiss for lack of subject matter jurisdiction.

### Relevant Facts [2]

Bay View Church is a local parish of the United Methodist Church which has been in existence in Milwaukee since 1868. (Affidavit of Pastor Lowell Bartel [Bartel Aff.] ¶ 2). The United Methodist Church is a Christian-based religious organization that began in England in 1729. (Bartel Aff. ¶ 3). The United Methodist Church's beliefs are grounded in the mainstream Christian principles that God exists, that Jesus Christ came to this earth to spread God's word, and that the members of the church can seek to create a closer relationship with God and Jesus by engaging in the study of scripture and sharing community worship services. (Bartel Aff. ¶ 3).

The Bay View Church Staff–Parish Relations Committee, which is comprised of approximately nine congregational members who volunteer for three-year terms, makes all employment decisions on behalf of the defendant. The committee makes decisions based on the majority vote of the members. (Bartel Aff. ¶ 8). It and other committees that run the day-to-day operations of Bay View Church report to the Administrative Council, which is Bay View Church's main governing body. The Administrative Council oversees all aspects of the defendant's operations, but did not have any role in the hiring or firing of the plaintiff. (Bartel Aff. ¶ 8).

Bay View Church's current congregation consists of approximately 500 members. (Bartel Aff. ¶ 3). Although Bay View Church's members organize and attend a variety of community activities at the church, the main gathering for the congregation members, like that of most churches, are two weekly worship services on Sunday mornings. (Bartel Aff. ¶ 4). The worship services are the times when the congregation members gather together for the purpose of renewing their beliefs and establishing their relationship with God. (Bartel Aff. ¶ 4). The structure and order of the worship services are determined by the pastor of the parish who is responsible for coordinating the elements of scripture, music, word, and prayer into a meaningful spiritual experience for those congregation members gathered. (Bartel Aff. ¶ 4).

At the time of the plaintiff's hire, the defendant had two choirs, the Chancel Choir and the Contemporary Christian Choir. (Bartel Aff. ¶ 5). The choirs were specifically formed only to participate in the Sunday worship services and participation in the choirs was completely voluntary. (Bartel Aff. ¶ 6).

In April 1997, the plaintiff was hired by defendant Bay View Church as the choir director and music director for its Sunday worship services. (Affidavit of Leela P. Miller [Miller Aff.] ¶ 2); (Bartel Aff. ¶ 5). The plaintiff was a member of the Christian Methodist Episcopal Church and a self-proclaimed "religious" and "spiritual" person. (Affidavit of William T. Stuart [Stuart Aff.] ¶ 4, Exh. C, Deposition of Leela P. Miller [Miller Dep.] at 58).

Prior to being hired by the defendant, the plaintiff went through an interview process with a special selection committee consisting of three members of the Chancel Choir. (Bartel Aff. ¶ 7). The selection committee was charged with the task of interviewing applicants and forwarding recommendations to the Staff–Parish Relations Committee, which made the ultimate

---

**2.** These relevant facts are based upon the undisputed facts taken from evidentiary materials submitted by the parties.

decision to hire the plaintiff. (Bartel Aff. ¶ 7). During the interviewing process, the plaintiff's responsibilities as the choir director and music director for the defendant were described as leading the Chancel Choir and the Contemporary Christian Choir. (Miller Aff. ¶ B).

During the plaintiff's interview with the selection committee, she was told her basic job responsibilities were to choose appropriate musical selections for the Sunday worship services and to prepare and direct the choirs in leading the congregation in song. (Affidavit of Juanita Schaefer [Schaefer Aff.] ¶ 4). Additionally, the committee members explained to the plaintiff that she was expected to research the religious themes of the upcoming services in religious books in the defendant's small music library and to select music that coincided with the religious themes and meanings of that particular service. (Schaefer Aff. ¶ 4). The selection committee informed the plaintiff that she was expected to select the music for a particular service at least three weeks in advance to allow time for the choirs to practice the music for the worship service. (Schaefer Aff. ¶ 4).

The selection committee also provided the plaintiff with copies of job descriptions for the positions of Chancel Choir Director and Director of Music at the time of her interview. (Shaefer Aff. ¶ 5). The printed job description for Chancel Choir Director contains a section entitled "Responsibilities and Expectations." (Schaefer Aff. ¶ 5, Exh. A). Such responsibilities and expectations include: "Conduct and lead weekly rehearsals," "Conduct and lead choir in anthems, weekly at the second service," "Prepare Choir to lead congregation in Hymns," "Select and prepare music well in advance of presentation," and "Where possible music to fit the liturgy and or the lectionary," and "Purchase music with the established budget." (Shaefer Aff. ¶ 5,

Exh. A at 1 [unnumbered] ). The "Policy" section of the Chancel Choir Director job description states that Music in Worship rests upon the following "music ministry keys:" a) variety is essential, b) quality expected, c) ministry, not performance, and d) members are more important than gorgeous music. (Shaefer Aff. ¶ 5, Exh. A at 1).

The "Policy" section of the Director of Music job description has the same "Music in Worship" elements, except in reference to the Contemporary Christian Choir. The "Responsibilities and Expectations" for Director of Music also states that the Music Director was to "[e]ncourage and promote Music Ministry outreach." (Shaefer Aff. ¶ 5, Exh. B at 2 [unnumbered] ).

Following her interview with the selection committee, the plaintiff also interviewed with members of the two choirs she was to direct. (Affidavit of Patricia A. Pritchard [Pritchard Aff.] ¶ 7). The selection committee determined after the interview that the plaintiff's qualifications seemed to fit the defendant's needs for a religious music leader for its Sunday worship services. (Schaefer Aff. ¶ 6). In addition, the selection committee's recommendation to the Staff–Parish Committee included the statement that the plaintiff's "ethnic background" would be a "positive for [the] congregation." (Schaefer Aff. ¶ 8, Exh. C at 2).

The plaintiff's final interview was with Pastor Bartel who reiterated the job responsibilities that the congregation expected her to perform, including preparing the music for the Sunday worship service, practicing with the choirs in the weeks before the worship services, and leading the choirs and congregation in song during the Sunday worship services. (Bartel Aff. ¶ 9). Shortly thereafter, the plaintiff was

hired as the Choir Director/Music Director for Bay View Church. (Bartel Aff. ¶ 9).

During her tenure with defendant Bay View Church, the plaintiff selected the songs in the worship services by evaluating the particular message of a service and selecting music that "coincided" with and "enhanced" the meaning of that message. (Stuart Aff. ¶ 4, Exh. C, Miller Dep. at 75–76). The plaintiff directed each musical selection that was performed by the chorus at the weekly worship services, but directing the choirs did not require her to perform in the singing or playing of the music. (Miller Aff. ¶¶ 18–19). The plaintiff selected music for each performance based in part on a planner that was given to her by the defendant, which included music suggestions for each service. (Miller Aff. ¶ 20). When the plaintiff asked in her deposition what she thought "the purpose of a choir is in a church setting?," she responded, "To lift voices and sing praises to the lord." (Stuart Aff. ¶ 4, Exh. C, Miller Dep. at 79).

The plaintiff's employment as choir director and music director was terminated by the defendant on October 17, 1997. (Bartel Aff. ¶ 14). The plaintiff filed a complaint alleging race discrimination with the Equal Rights Division (ERD) of the Wisconsin Department of Industry, Labor and Human Relations and with the Equal Employment Opportunity Commission (EEOC) on December 26, 1997. (Stuart Aff. ¶ 2, Exh. A). On June 19, 1998, the ERD issued a Preliminary Determination and Order dismissing the complaint on the ground that the ERD lacked jurisdiction. (Stuart Aff. ¶ 3, Exh. B).

### Analysis

In seeking to dismiss this action for lack of subject matter jurisdiction, the defendant asserts that the plaintiff's position at Bay View Church as Choir Director/Music Director was inherently ecclesiastical. As such, the defendant argues that its decisions concerning the plaintiff's employment are placed beyond review by this court by the religion clauses of the First Amendment. The issue presented by the defendant's motion represents the intersection of two important objectives—the protection of the religious freedoms on which the nation was founded and the protection of individuals' civil rights through the eradication of discrimination.

The clauses of the First Amendment pertaining to the freedom of religion state, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. CONST. AMEND. I. This amendment is considered to contain two clauses: the Free Exercise Clause and the Establishment Clause. Distinct and different analytical frameworks are to be applied in the analysis of claims presented under each of these clauses.

### Free Exercise Clause

Although on its face the First Amendment only sets forth a limit on Congress, the Court has determined that the limits placed on the government by the First Amendment extend to the judicial branch as well as the legislative branch. *Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960). In *E.E.O.C. v. Catholic University of America,* 83 F.3d 455, 460 (D.C.Cir.1996), the appellate court noted that the Supreme Court has stated that governmental action may be found to impermissibly burden the free exercise of religion in two quite different ways:

[First,] by interfering with a believer's ability to observe the commands or practices of his faith, see, e.g. *Church of the Lukumi Babalu Aye., Inc. v. City of Hialeah,* 508 U.S. 520, 531–533, 113

S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons"), and [second] by encroaching on the ability of a church to manage its internal affairs. See, e.g., *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church of North America*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (Free Exercise Clause protects power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine").

■ In determining whether such scrutiny of a religious employer would violate the Free Exercise Clause, the three following factors are to be weighed:

(1) the magnitude of the statute's impact upon the exercise of the religious belief; (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief; and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*E.E.O.C. v. Mississippi College*, 626 F.2d 477, 488 (5th Cir.1980) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 [1972] and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 [1963] ).

■ Generally, Title VII applies to religious organizations. Congress, given the opportunity to exempt religious employers entirely, created instead a tailored exemption which exempts from operation of the

statute only those hiring decisions made by religious employers on the basis of religion.[3] Nonetheless, the statute precludes the same institutions from making decisions which are based on race, sex or national origin. See *E.E.O.C. v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1277 (9th Cir.1982); *E.E.O.C. v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 282 (5th Cir.1981); *Rayburn v. Seventh–Day Adventists*, 772 F.2d 1164, 1166 (4th Cir.1985).

■ Notwithstanding the exemption created by Congress, courts have carved out an additional exemption recognizing that some religious interests are "so strong that no compelling state interest justifies government intrusion into the ecclesiastical sphere." See *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 946 (9th Cir.1999). In particular, the Court is wary of state intrusion on a church's selection of its ministers and spiritual leaders, and the promulgation of religious doctrine. See *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

As a result, courts, including the court of appeals for this circuit, have recognized an "ecclesiastical" or "ministerial" exception which precludes the application of Title VII to the employment relationship between certain individuals and religious institutions. See *Young v. Northern Illinois Conference of United Methodist Church*, 21 F.3d 184, 185–88 (7th Cir.1994). The ministerial exception is aimed at preventing the introduction of government stan-

---

**3.** 42 U.S.C. § 2000e–1 (a) provides in relevant part, "This subchapter shall not apply to... a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particu-

lar religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

dards into a religious institution's selection of its own clergy. *See Catholic University,* 83 F.3d at 460.

Application of the ministerial exception has not been limited to cases involving clergy. Lay employees of religious institutions have been deemed "ministers" for the purposes of the exception where their "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Rayburn,* 772 F.2d at 1169 (internal quotation marks and citation omitted); *see also, Starkman v. Evans,* 198 F.3d 173 (5th Cir.1999) (choir director of Methodist Church found to be "minister" barring application of Title VII to employer church).

■ The applicability of the ministerial exception is a question of law for the court. *Southwestern Baptist,* 651 F.2d at 285. The court focuses on the function of the employee and applies the exception if the position is "important to the spiritual and pastoral mission" of the religious institution. *Rayburn,* 772 F.2d at 1169. Where an individual's employment responsibilities are sufficiently ecclesiastical, a court may determine that it is precluded from scrutinizing a religious institution's allegedly discriminatory action in the employment context. *See Young,* 21 F.3d at 187. In general, the more closely an employee's job responsibilities are tied to the ministering, governing, or the development of an orthodoxy, the less likely courts are to apply Title VII to employment decisions made by the religious institution regarding that employee.

In *Starkman v. Evans,* 198 F.3d 173 (5th Cir.1999), the court applied the ministerial exception on facts similar to those before this court. The plaintiff, Ms. Starkman, a Choirmaster and Director of Music of a Methodist Church sued the church under the Americans with Disabilities Act (ADA) and a Louisiana state retaliatory discharge statute. In finding that the plaintiff was a "minister" for the purposes of the exception, thereby barring the application of the anti-discrimination and anti-retaliation statutes to the church, the court analyzed whether: 1) the employment decision was based largely on religious criteria; 2) the employee was qualified and authorized to perform the ceremonies of the church; and 3) the employee engaged in activities traditionally considered ecclesiastical or religious, including whether the plaintiff attends to the religious needs of the faithful. *Id.* at 176. The court stated that the third factor was probably the most important. *Id.*

■ In this case, the government action at issue is this court's scrutiny of defendant Bay View Church's actions with respect to the termination of the plaintiff's employment under Title VII. The court will analyze the same factors which were considered in *Starkman* to determine whether plaintiff Miller's position as the Music and Choir Director of Defendant Bay View Church was of such an ecclesiastical nature so as make the ministerial exception applicable and preclude review of the termination of the plaintiff's employment under Title VII.

With regard to the first *Starkman* factor, whether the defendant's decision to hire the plaintiff was based largely on religious criteria, the plaintiff contends that she was hired "based primarily, if not exclusively, on her substantial musical qualifications." (Memorandum in Opposition to Motion to Dismiss for Lack of Subject Matter Jurisdiction [Opposition Memorandum] at 6). It is undisputed that the defendant sought a musically qualified applicant to direct its choirs. However, job descriptions for the positions of Director of Music and Chancel Choir Di-

rector which the defendant provided to the plaintiff and discussed with her during the interview process reveal that more was required of the positions than mere musical ability.

The policy sections of both job descriptions state that music in worship rests upon the following "music ministry keys,"—ministry, not performance, and members are more important than gorgeous music. Both job descriptions also contain a "Responsibilities and Expectations" section. The Director of Music job description includes two responsibilities which are of particular significance with respect to religious criteria. The Director must "ensure appropriate music for all regular services of the church" and "encourage and promote [m]usic [m]inistry outreach."

Additionally, one of the responsibilities of the Chancel Choir Director job is, where possible, to choose music to fit the liturgy and or the lectionary. The policies, responsibilities and expectations of the jobs demonstrate that the defendant expected that a music ministry role be fulfilled by the Director of Music and the Choir Director.

The court further notes that during her interview the plaintiff was asked what religious denomination she was. *See* Miller Aff. ¶ 10. Such inquiry suggests that the defendant viewed the position as a non-secular one. Thus, the record reflects that the defendant's decision to hire the plaintiff was based largely on religious criteria, satisfying the first element under *Starkman.*

With respect to the second *Starkman* factor, the plaintiff was qualified and authorized to perform the ceremonies of the church. She was responsible for selecting, planning and directing every anthem and song performed by the choirs or sung by the congregation. This process required

the plaintiff to research the religious messages of Sunday services and to select music which coincided with those themes.

The plaintiff has pointed to factors which "limit[ed] the Plaintiff's need to exercise her discretion over the music choices." (Opposition Memorandum at 9). In this regard, she notes that the Bay View Church provided her with a planner which contained suggestions for matching musical selections with themes. (Miller Aff. ¶ 20). The defendant also required that the plaintiff's selections come from arrangements available in the church's music library, and subjected her selections to final approval by the church pastor. (Miller Aff. ¶¶ 20–21).

Nonetheless, the plaintiff did research religious themes in anticipation of attending and participating in each worship service as the director of the choirs. The mere fact that the defendant furnished a planner and somewhat limited the scope of the musical pieces open to selection by the plaintiff does not divest the plaintiff of her qualification and authorization to perform the ceremonies of the church.

With respect to the third *Starkman* factor, the plaintiff emphasizes that she did not attend to the religious needs of the faithful in the same manner as plaintiff Starkman who was designated to be a ministerial presence to the needs of ailing parishioners. *See, Starkman,* 198 F.3d at 176. However, the facts establish that the plaintiff engaged in traditionally ecclesiastical or religious activities. The plaintiff viewed her own role as having religious significance. For example, when asked at her deposition what she thought "the purpose of a choir is in a church setting," the plaintiff responded, "to lift their voices and sing praises to the lord." (Stuart Aff. ¶ 4, Exh. C, Miller Dep. at 79).

Furthermore, as Choir and Music Director, the plaintiff attended to the religious needs of the faithful. Participation in the choirs was voluntary. (Bartel Aff. ¶ 6). The choirs were specifically formed only to participate in the Sunday worship services and the two Sunday services are the time when the congregation members gather together for the purpose of renewing their beliefs and establishing their relationship with God. (Bartel Aff. ¶ 4, 6). A parishioner averred that she considers the songs selected and directed by the plaintiff "to be a form of prayer to God and Jesus Christ." (Affidavit of Jean Kreider [Kreider Aff.] ¶ 2). She further feels that "[t]hose songs help me reach a deeper spiritual connection with my God and facilitate a more meaningful worship experience for me." *Id.*

Based on the foregoing, this court concludes that the plaintiff engaged in traditionally ecclesiastical or religious activities. Thus, this court concludes that the ministerial exception is applicable and that the application of Title VII to the defendant's decision to terminate the plaintiff's employment would violate the Free Exercise Clause of the First Amendment. The court now turns its attention to the Establishment Clause.

### Establishment Clause

██ A three-prong test to determine whether a statute violates the Establishment Clause was articulated by the Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2125, 29 L.Ed.2d 745 (1971). To survive analysis under the Establishment Clause: 1) a statute must have a secular legislative purpose; 2) its principal or primary effect must be one that neither advances nor inhibits religion; and 3) it must not foster an excessive government entanglement with religion. *Id.* at 613, 91 S.Ct. 2125.

Title VII does not, on its face, create excessive entanglement. The congressional exemption contained in 42 U.S.C. § 2000e–1(a) insulates those institutions to which application of the statute would present establishment clause problems. Moreover, courts have held that Title VII has a clear secular purpose and a primary effect which neither advances nor inhibits religion. *See Rayburn*, 772 F.2d at 1170 n. 7; *Bollard*, 196 F.3d at 948; *Pacific Press*, 676 F.2d at 1281–82. Furthermore, the defendant does not contend that Title VII violates either the first or second prongs of the *Lemon* test. Therefore, in applying the *Lemon* test to Title VII, only the third prong concerning excessive entanglement need be addressed.

██ Entanglement is measured by the "character and purposes" of the institution affected, the nature of the benefit or burden imposed, and the resulting relationship between the government and the religious authority. *Lemon*, 403 U.S. at 615, 91 S.Ct. 2125. Such entanglement can occur two ways—procedurally and substantively. Procedural entanglement arises "in situations where a protracted legal process pits church and state as adversaries," while substantive entanglement arises "where the Government is placed in a position of choosing among competing religious visions." *Catholic University*, 83 F.3d at 465 (internal citations and quotations omitted).

██ In the present case, if the court were to apply Title VII to defendant Bay View Church, the Bay View Church's "personnel and records would inevitably become subject to subpoena, discovery, cross examination, [and] the full panoply of legal process designed to probe the mind of the church in the selection of its ministers." *See Rayburn*, 772 F.2d at 1171. These legal processes would be likely to divert the resources and attentions of the defen-

dant away from its religious mission. As noted in *Rayburn*, 772 F.2d at 1171:

> There is the danger that churches, wary of EEOC or judicial review of their [employment] decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members.

Thus, excessive procedural entanglement would occur by allowing the commencement of a potentially protracted legal process.

On a substantive level, courts have held that sufficiently extensive inquiry into the employment of clergy and spiritual leaders by a church may constitute excessive entanglement. *See Catholic University*, 83 F.3d at 466. In *Bollard*, 196 F.3d at 948, the court stated:

> applying the statute to the clergy-church relationship creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake. A religious organization's decision to employ or terminate employment of a minister is at the heart of its religious mission.

In *Young*, 21 F.3d 184, 187 (7th Cir. 1994), the court determined that even superficial probing by government into the employment decisions of a religious entity offends the First Amendment. The court held that "civil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are in themselves an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." *Id.* (construing *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 [1976]).

In this case, the plaintiff asserts that the reasons given for discharge by Bay View Church "were merely a pretext for racial discrimination." (Opposition Memorandum at 16). The plaintiff has argued that the determination of whether the church's justification was merely pretexual does not require a governmental intrusion into the doctrine or beliefs of the church. *Id.*

Acceptance of the plaintiff's argument, would require the court to reach the merits of the plaintiff's claim. It would also present the type of questions which the First Amendment precludes the court from considering. For example, the court would have to determine whether the plaintiff, in fact, adequately performed her job. This would lead to an inquiry into and a determination of the qualities of an effective United Methodist Church Choir Director/Music Director. Such an inquiry is the province of the church, not this court. Excessive substantive entanglement would result from the court's review of the merits of the plaintiff's Title VII claim against the defendant.

All three prongs of the *Lemon* test must be satisfied for a statute to survive analysis under the Establishment Clause. Because excessive procedural and substantive entanglement would be created if Title VII were applied to the defendant, the third prong has not been satisfied. Therefore, the application of Title VII to the defendant's decision to terminate the plaintiff's employment would violate the Establishment Clause of the First Amendment.

In sum, this court concludes that it is precluded from applying Title VII to defendant Bay View Church's decision to terminate the plaintiff's employment as Music and Choir Director on both Free Exercise and Establishment Clause grounds. As such, the court will grant the defendant's motion to dismiss for lack of subject matter jurisdiction.

## ORDER

**NOW, THEREFORE, IT IS OR-DERED** that the defendant's motion to dismiss for lack of subject matter jurisdiction, which this court has treated as a "suggestion" to dismiss for lack of jurisdiction under Fed.R.Civ.P. 12(h)(3), be and hereby is **granted.**

**IT IS FURTHER ORDERED** that the Clerk of United District Court enter judgment accordingly.