**Marny STATELY, Plaintiff,**

v.

**INDIAN COMMUNITY SCHOOL OF MILWAUKEE, INC., Defendant.**

No. 02–C–0817.

United States District Court, E.D. Wisconsin.

Dec. 30, 2004.

---

Marny Stately, San Diego, CA, Pro Se.

Brian A. O'Brien, Kevin Wadzinski, Gardner, Carton & Douglas, Washington, DC, David J. B. Froiland/Lawrence T. Lynch, Foley & Lardner, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

RANDA, Chief Judge.

The Indian Community School of Milwaukee, Inc. ("ICS" or "the school") hired Marny Stately ("Stately") in August 2001 and fired her five months later. (Compl.¶ 5.) Stately believes that her termination was unlawful and is suing ICS. She claims ICS discriminated against her on the basis of her religion and her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 (" § 1981"), and the Wisconsin Fair Employment Act, Wis. Stat. §§ 111.321–.322 ("WFEA"). She also alleges breach of contract and wrongful termination.

Before the Court are several motions. First, ICS has moved the Court to dismiss the action for lack of subject matter jurisdiction based on the Free Exercise and Establishment Clauses of the First Amendment. ICS also has filed a motion asking the Court to extend the time for discovery and filing dispositive motions. Finally, Stately has recently filed a letter [1] requesting appointment of counsel. For the reasons set forth below, ICS's motion to dismiss for lack of subject matter jurisdiction is granted, and the remaining two motions-ICS's motion for extension of time for discovery and filing of dispositive motions and Stately's motion for appointment of counsel-are dismissed as moot.

## I. BACKGROUND

ICS is a private elementary and middle school in Milwaukee, Wisconsin. (Mem. Supp. Mot. Dismiss ("Mem.") at 2.) Established in 1969, ICS seeks to offer students an education based on traditional Indian spiritual and cultural principles. (*Id.*) All of the school's students are either mem-

---

1. Stately wrote the Court a letter in response to a Court order directing her to respond to ICS's motions. Four days after her responses were due, Stately informed the Court in her letter that she had been unsuccessful at finding an attorney. She says she "could not afford to hire [an attorney] or [an attorney was not] interested in [her] case." She ends her letter with a request for appointment of counsel.

Stately's letter does not satisfy the technical requirements of a motion. Civil Local Rule 7.1 requires that "[e]very motion must set forth the rule pursuant to which it is made." United States District Court for the Eastern District of Wisconsin, Local Rules, Civil Local Rule 7.1. Stately fails to satisfy that requirement. Moreover, whether she is requesting counsel pursuant to 28 U.S.C. § 1915 or 42 U.S.C. § 2000e-5(f)(1)-the two options available to her-Stately does not give the Court any of the information necessary to make a decision. *See, e.g., Gil v. Reed,* 381 F.3d 649, 656 (7th Cir.2004) (under § 1915 litigant must make showing that she (1) is indigent and (2) "has made reasonable efforts to retain counsel and was unsuccessful or that [she] was effectively precluded from making such efforts"); *Darden v. Illinois Bell Tel. Co.,* 797 F.2d 497, 500–01 (7th Cir.1986) (under 42 U.S.C. § 2000e-5(f)(1) court may consider three factors (if not others) in determining whether counsel should be appointed: (1) merits of the plaintiff's claim; (2) plaintiff's diligence in attempting to obtain a lawyer; and (3) plaintiff's ability to pay a lawyer). Despite these shortcomings, the Court will address Stately's letter as if it is a motion.

bers of Indian tribes or of Indian descent, as are the members of its Board of Directors. (*Id.*)

The school focuses primarily on developing its students spiritually, as well as emotionally, physically, socially, artistically, and intellectually. (*Id.* at 3.) To achieve this development, ICS teachers are directed to expose students to as much Indian culture and spiritual belief in the classroom as possible. (*Id.*) Teachers, as a condition of their employment, are required to teach and engage in traditional Native American ceremonies on a regular basis and participate in the school's spiritually based mentorship program. (Decl. of Jo Lewis ("Lewis Decl.") ¶ 9.) The students' tribal backgrounds are diverse, however, so the school is careful not to overemphasize the spiritual traditions of one tribe to the exclusion of another. (Mem. at 4.) Moreover, many of the students also practice traditional western religions, like Catholicism, and various forms of Protestantism, among others. (*Id.*)

ICS regularly conducts religious ceremonies. On the first day of every month, the school holds opening ceremonies and on the last day of every month, closing ceremonies. (Lewis Decl. ¶ 17.) Attendance is mandatory for students and teachers alike. (*Id.*) The ceremonies include culturally and spiritually significant activities like pipe ceremonies, drumming, song, and prayer. (*Id.* ¶¶ 17, 20.) The school also hosts sweat lodge ceremonies twice a month. (Decl. of Brian Gunn ("Gunn Decl.") Ex. 1 at 23–24.) The school has its own sweat lodge structure, constructed of willow, where, during the ceremonies, heated rocks are brought into a pit inside the lodge. (*Id.* at 23 & 24 n. 10.) The sacred sweat lodge ceremonies are believed to provide physical and spiritual healing to individuals and communities

alike. (*Id.* at 23.) Students and faculty also make regular use of the school's spirit pole, both formally and informally, by performing rituals or praying. (*Id.* at 25.) Like the sweat lodge, the spirit pole is considered a sacred place. (*Id.*) Constructed of cedar (regarded as a cleansing substance), the pole is adorned with tobacco and eagle feathers. (*Id.*) Spirit poles have been described as the *axis mundi*— the center around which the earth turns. (*Id.*) The school observes seasonal feasts to celebrate the changing of the seasons. (*Id.* at 29.) Smudging-a method of prayer and blessing involving the spreading of smoke from aromatic herbs-is practiced regularly. (*Id.* at 30.)

The school also has at least four full-time positions for Native American cultural, spiritual, and language specialists. (Aff. of Dr. Linda Sue Warner ("Warner") ¶ 6.) [2] These specialists foster a deeper understanding of rituals and ceremonies. The language teachers, besides teaching conversational language skills, teach students and other teachers prayers and blessings in either the Ojibwe, Menominee, or Oneida language. (Decl. of Cheryl Weber ¶¶ 5–7.)

For a brief time Stately was a teacher at ICS. During her time at the school, Stately participated, and sometimes assumed a leadership role, in various religious and cultural ceremonies. (Answers to Req. for Admission ¶¶ 21–22, 24–25, 39–43, 62, 63.) She also served as a mentor to several students in the school's spiritually based mentorship program. (Lewis Decl. ¶ 14; Warner Aff. Ex. 11.) Like the other teachers, Stately was expected to incorporate Native American cultural and religious traditions into her lessons. In December 2001, apparently unhappy with her lack of respect for the variety of religious

---

**2.** Warner's Affidavit is attached to the Declaration of Brian Gunn as Part 2 of Exhibit 1.

traditions at the school, ICS fired Stately. (Compl.¶ 5.) Not surprisingly, ICS and Stately disagree on the reasons she was fired. In response to her termination, Stately began a series of legal actions culminating in the filing of this suit in August 2002.

Stately has consistently failed, however, to diligently prosecute her action in this Court. When Stately's original counsel withdrew, the Court granted her time to find new representation. After three months of waiting, the Court issued an order giving Stately thirty additional days either to find an attorney or move the case forward on her own.[3] Stately never found an attorney.

Once on her own, Stately's dereliction quickly became blatant. For months Stately disregarded the Court's order to notify ICS of her experts by July 1, 2003, and her lay witnesses by August 8, 2003 (she had done neither by late November 2003). Similarly, Stately's Rule 26(f) initial disclosures were over six months late. She never provided ICS with signed and sworn responses to Requests for Admissions and Interrogatories.[4]

Stately has also made it impossible for ICS to depose her. Stately's deposition was first set for Monday, October 13, 2003. On Friday, October 10, 2003, despite having nearly one month's notice of the deposition date, Stately informed ICS that she would not be at the deposition. Stately had moved to California since filing her lawsuit and claimed to be unable to return to Milwaukee for the deposition. The Court again ordered Stately to make herself available for deposition, this time on or before May 10, 2004. The Court made it clear that further delay in discovery would not be tolerated. (See Second Amended Scheduling Order, April 7, 2004 ("Neither the pendency of motions nor settlement discussions shall affect any of the dates set in this action, and neither shall justify delays in the taking of discovery.").) But Stately's cavalier disobedience continued. Stately, once again, did not attend her deposition and told ICS that she would not do so until later.

Over two years passed in the litigation and discovery had gone virtually nowhere. Consequently, ICS filed a motion to dismiss and a motion to extend discovery. Though Stately did not respond to ICS's motions, the Court denied them without prejudice because ICS had not shown that it served Stately. After the Court denied ICS's motions, however, Stately wrote a letter to the Court admitting that she had been served. In her letter, she noted that, while she did not oppose ICS's motion to extend discovery, she needed forty-five more days to respond to ICS's motion to dismiss. Stately's request for extra time came eight days after her responsive deadline had passed. Satisfied that Stately had, in fact, been served, the Court reopened ICS's motions and gave Stately two weeks to respond.[5] Two weeks came and two weeks went; Stately did not respond. Then, four days after her deadline

---

3. Stately is apparently an attorney. She received her law degree from the University of Wisconsin and practiced law in Wisconsin from 1982–1988. (See Letter from Barbara O'Brien, November 25, 2003 [Docket No. 21].)

4. Stately provided responses to the Requests for Admissions and Interrogatories, but she did not sign or swear to her responses. Despite repeated reminders from ICS, and several promises that she would sign her responses, Stately still has not done so.

5. The two-week window that Stately was given created a new deadline more than forty-five days after her original deadline. In other words, the Court effectively gave Stately the time she requested.

and over two years after her lawyer withdrew, Stately wrote a letter requesting that the Court appoint her counsel.

■■ Thus, ICS's motion to dismiss is still unopposed. Were it empowered, the Court would dismiss the action *sua sponte* for Stately's failure to prosecute. *See, e.g., Casteel v. Pieschek,* 3 F.3d 1050, 1055 (7th Cir.1993) ("Under Federal Rule of Civil Procedure 41(b), dismissal is appropriate when there is a clear record of delay or contumacious behavior." (quotations omitted)); *Daniels v. Brennan,* 887 F.2d 783, 785 (7th Cir.1989) ("District courts have inherent authority to dismiss a case *sua sponte* for a plaintiff's failure to prosecute."). In this case, though, the Court cannot yet dismiss Stately's action for failure to prosecute because subject-matter jurisdiction has been called into question. A question regarding subject-matter jurisdiction is an inquiry of the first priority-it must be addressed before the Court may proceed to any other matters. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (rejecting the so-called doctrine of "hypothetical" or "assumed" jurisdiction and holding that courts should address subject-matter jurisdiction first); *Crestview Vill. Apartments v. United States Dep't of Hous. & Urban Dev.,* 383 F.3d 552, 557 (7th Cir.2004); *State of Illinois v. City of Chicago,* 137 F.3d 474, 478 (7th Cir.1998)("Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further.").

## II. SUBJECT–MATTER JURISDICTION

■■ Stately asserts (on the face of her complaint) that this Court has subject-matter jurisdiction because, by invoking Title VII and § 1981, she raises federal questions. *See* 28 U.S.C. § 1331. Stately is also suing ICS under three state-law causes of action-a WFEA violation, breach of contract, and wrongful termination-over which she must believe the Court to have supplemental jurisdiction. *See* 28 U.S.C. § 1367. The Court may exercise supplemental jurisdiction over state-law claims only when it has original jurisdiction over the federal claims. § 1367(a). If the Court determines that it has no subject-matter jurisdiction over Stately's federal claims, it is canonical that the Court *cannot* exercise supplemental jurisdiction over her state-law claims. *See Rifkin v. Bear Stearns & Co.,* 248 F.3d 628, 634 (7th Cir.2001); *Scarfo v. Ginsberg, DBG 94, Inc.,* 175 F.3d 957, 962 (11th Cir.1999); *Musson Theatrical, Inc. v. Fed. Express Corp.,* 89 F.3d 1244, 1255 (6th Cir.1996), *as amended on Denial of Reh'g and Reh'g En Banc,* 1998 WL 117980 (6th Cir. Jan.15, 1998); *Randolph v. Budget Rent–A–Car,* 97 F.3d 319, 329 (9th Cir.1996); *Toste Farm Corp. v. Hadbury, Inc.,* 70 F.3d 640, 646 n. 11 (1st Cir.1995); *Womble v. Bhangu,* 864 F.2d 1212, 1213 (5th Cir.1989). Accordingly, the Court begins by considering only whether it has subject-matter jurisdiction over Stately's Title VII and § 1981 claims.[6]

■■ Once a party has "fairly cast [the existence of jurisdiction] into doubt," the

6. With respect to Title VII and § 1981 claims, the Seventh Circuit has held that "[a]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 940 (7th Cir.1996). In Stately's case, she invokes the two statutes to attack the same type of alleged discrimination-discrimination based on her race or ancestry. So in this case, the Title VII and § 1981 claims are substantively and procedurally identical. Thus, the Court is comfortable that if the First Amendment prevents a Title VII action from being heard, it also prevents a § 1981 action from being heard.

party asserting jurisdiction has the burden of presenting evidence that jurisdiction exists. *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 607 (7th Cir.1997); *Selcke v. New England Ins. Co.*, 2 F.3d 790, 792 (7th Cir.1993); *see also* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). So, if jurisdiction is fairly cast into doubt, Stately must support her allegations with "competent proof ... which in our circuit requires [Stately] to offer evidence which proves to a reasonable probability that jurisdiction exists." *Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 427 (7th Cir.1997) (internal citations omitted); *Wellness Cmty. Nat. v. Wellness House*, 70 F.3d 46, 49 (7th Cir.1995).

Although most courts speak of "burdens" only with respect to the party asserting jurisdiction, this Court must consider the "burden" of the party challenging jurisdiction. Because Stately has not responded to ICS's motion to dismiss, there is no question that she has failed to carry whatever burden she might bear. The question, then, is whether ICS fairly cast jurisdiction into doubt. If it has, the action must be dismissed for lack of subject-matter jurisdiction because Stately failed to offer evidence which proves to a reasonable certainty that jurisdiction exists. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d at 607; *Selcke*, 2 F.3d at 792.

■ There are two ways to challenge subject matter jurisdiction. A party may argue that subject matter jurisdiction is not evident on the face of the complaint. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir.2003). In such a case the Court analyzes the motion by assuming that the allegations in the complaint are true. *Id.* Another way to challenge subject matter jurisdiction is to challenge it *in fact. Id.* When a complaint is formally sufficient and a party challenges subject matter jurisdiction in fact, "the movant may use affidavits and other material to support the motion." *Id.* In that event, "the court is free to weigh the evidence to determine whether jurisdiction has been established." *Id.* ICS's motion challenges the subject-matter jurisdiction of this Court in fact.

■ ICS contends that the Free Exercise and the Establishment Clauses of the First Amendment prevent the Court from having subject-matter jurisdiction over this case. The First Amendment states, in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. Amend. I. This language, containing both the Free Exercise and Establishment Clauses, precludes the judicial branch from interfering in the exercise of religion. *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960). Specifically, ICS argues that the Free Exercise Clause forecloses courts from intruding into the ecclesiastical sphere and issuing rulings on employment decisions. Moreover, ICS maintains that the Establishment Clause stops the Court from applying federal employment statutes to the school. The Court finds that ICS's arguments, while not unassailable, fairly cast jurisdiction into doubt. Because Stately has not responded to ICS's motion (and the Court cannot seek out facts beyond those in the record), based on *this* record, the Court cannot say that it has jurisdiction to hear this case.

## A. Free Exercise Clause

The Seventh Circuit has squarely held that applying the provisions of Title VII to

the employment relationship between a religious institution and its minister would violate the Free Exercise Clause of the First Amendment. *Alicea–Hernandez v. Catholic Bishop of Chicago,* 320 F.3d 698, 702–03 (7th Cir.2003); *Young v. N. Illinois Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994). ICS argues that Stately's claims fit squarely within this constitutional restriction of subject matter jurisdiction. This argument begs two questions: (1) Is ICS a religious institution entitled to the protection of the First Amendment? and, if so, (2) Was Stately's position a ministerial one?

## 1. Religion

■ ICS argues that it is an institution promoting a religion. Yet, ICS never tells the Court what its religion is. ICS embraces a variety of religions and their teachings. There is little, if any, guidance in the cases on whether ICS's teachings and programs are properly characterized as religion under the First Amendment. *See Africa v. Pennsylvania,* 662 F.2d 1025, 1031 (3d Cir.1981) ("The Supreme Court has never announced a comprehensive definition of religion for use in" First Amendment cases.). Indeed, because ICS's students, teachers, and administrators are admittedly affiliated with different western religions as well as tribal religions, the question is even more difficult. ICS is more like a melting-pot of religions than an institution promoting an identifiable, specific, and unified system of beliefs.

■ Nevertheless, a "religion" for purposes of First Amendment protection need not be mainstream, popular, well-organized, or even formally identifiable. *See United States v. Ballard,* 322 U.S. 78, 86–87, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

It is not the veracity of the religious beliefs that is tested, but the sincerity with which they are held. *United States v. Seeger,* 380 U.S. 163, 176, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Ballard,* 322 U.S. at 86–88, 64 S.Ct. 882; *Africa,* 662 F.2d at 1031. *But see Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)(noting that the "concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests," and holding that secular or philosophical beliefs do not receive the protection of the First Amendment's Religion Clauses). Usually a religion will address deep, fundamental questions. *Africa,* 662 F.2d at 1032. Religions are also usually comprehensive in nature, involving a belief system rather than isolated teachings. *Id.* Finally, religions are often marked by formal and external signs or ceremonies. *Id.*

■ Though they are not subject to the same boundaries as traditional western religions, Native American religions typically satisfy any constitutional test for "religion." Native Americans perform rituals, celebrate ceremonies, and observe sacred beliefs and practices, but their religions are less formal than many western religions. (*See* Expert Report of Deward E. Walker, Jr.[7] ("Walker Report") ¶ 2.) Native Americans tend to place a greater emphasis on oral rather than written tradition. (*Id.* ¶ 3.) They place far less emphasis on the structure of a "church" and more emphasis on nature, community, and the individual. (*Id.* ¶¶ 4–5.) Thus, Native American religions often do not have an identifiable hierarchical structure.

The line between sacred and profane does not exist in Native American cultures. Anthropologists and other scholars believe

---

**7.** Walker is a Professor of Anthropology and Ethnic Studies at the University of Colorado.

"Indian culture" and "Indian religion" to be inseparable. (*Id.* ¶ 8.) Courts, too, have recognized the interconnectedness of Native American culture and religion. *See, e.g., Bear Lodge Multiple Use Ass'n v. Babbitt,* 2 F.Supp.2d 1448, 1450 n. 2 (D.Wyo.1998) ("The Court is not persuaded that a legitimate distinction can be drawn in this case between the 'religious' and 'cultural' practices of those American Indians who consider Devils Tower a sacred site."), *aff'd* 175 F.3d 814 (10th Cir. 1999); *Reinert v. Haas,* 585 F.Supp. 477, 479 (S.D.Iowa 1984) ("Indian religion and Indian culture are one and the same. It is a way of life that is practiced constantly."); *Peyote Way Church of God, Inc. v. Smith,* 556 F.Supp. 632, 637 (N.D.Tex.1983) (noting that "[t]he legislative history of the American Indian Religious Freedom Act . . . is clear in finding that religion is an integral part of Indian culture.").

ICS maintains that courts have recognized Native American religions as "religion" for purposes of the First Amendment. But ICS cites to cases involving *a religion* (or at least a single religious belief), not *religions,* like the case at bar. *See Reinert,* 585 F.Supp. at 480 ("There is, of course, no question that *the Native American Religion* is a legitimate religion." (emphasis added)); *Alabama and Coushatta Tribes of Texas v. Trs. of the Big Sandy Indep. Sch. Dist.,* 817 F.Supp.

1319, 1325–29 (E.D.Tex.1993) (noting that the Native American Indian movement, a "Pan–Tribal" movement eschewing the practice of separate tribal religions and practicing traditional religions as a combined, single religion, is "religion" for First Amendment purposes; and specifically examining the sincerity of the members' belief that long hair is sacred), *remanded on other grounds,* 20 F.3d 469 (5th Cir.1994).[8] ICS is admittedly something of a religious diplomat-embracing all and offending none. But can that approach qualify an institution for the protection of the First Amendment?

ICS does not present the Court with the central tenets of a religion or even a suggestion that ICS propagates *a* religion. If it did, the situation would be more like that in *Reinert, Alabama and Coushatta Tribes of Texas,* and a number of other cases in which courts have applied First Amendment protections to religious institutions. *See, e.g., Alicea–Hernandez,* 320 F.3d 698; *Young,* 21 F.3d 184; *Curay–Cramer v. Ursuline Acad.,* 344 F.Supp.2d 923 (D.Del.2004); *Miller v. Bay View United Methodist Church, Inc.,* 141 F.Supp.2d 1174 (E.D.Wis.2001). But here ICS's religious position is amorphous-it is unclear what religious notions, other than tolerance (which is arguably a philosophical rather than religious notion), ICS actually subscribes to or propagates. Even

---

**8.** In *Reinert,* the plaintiffs were Native American inmates actively engaged in the practice of a formal religion known as "Native American Religion." *Reinert,* 585 F.Supp. at 478. Among its findings of fact, the court noted that inmates were of several specific faiths: Native American Religion, Catholicism, Judaism, American Muslim, and Moorish Science Temple, among others. *Id.* In other words, the court found that the Native American Religion had a specific, identifiable set of beliefs and practices. Similarly, in *Alabama and Coushatta Tribes of Texas,* the court considered whether several youths from the same

tribe held a sincere religious belief that wearing long hair is sacred. 817 F.Supp. at 1324. The youths were a part of a "Pan–Tribal" movement which sought to return to traditional Native American culture and heritage. *Id.* at 1325. That movement combined traditional tribal religions to practice them in a singular fashion, rather than reviving each one individually. *Id.* But the crucial question before the court was a singular one: whether the wearing of long hair was, by itself, a sincerely held religious belief. *Id.* at 1328–30.

though Native American religions are less formal and structured than other western religions, surely it would be a mistake (if not downright offensive) to refer to *all* Native American religions as *a single* religion.

Instead, ICS relies on the notion that, because it emphasizes both Native American culture and spirituality, and because the two are inseparable, the school is "religious" for purposes of the First Amendment. The school points out that, though many of its students simultaneously practice both Christian religions and traditional Native American ones, Native American religious beliefs do not require exclusivity.

Despite the conceptual difficulties its position poses to conventional western-religious thought, ICS has carried its "burden" of fairly casting jurisdiction into doubt. ICS presents evidence, including an expert declaration, that Native American religions are non-exclusive. In other words, Native American religions do not consider it contradictory to fully practice more than one religion. (*See* Walker Report ¶¶ 6.A, 6.C, & 6.D.) In addition, the Court does not question the genuineness of ICS's intent to propagate Native American culture and religion, nor the conviction with which its students, faculty, and administrators hold their beliefs. Accordingly, the Court accepts, on this record, that ICS is a religious institution.

## 2. Ministerial Position

■ Finding that ICS is a religious institution is only part of the First Amendment analysis. The Court also must consider whether Stately's position was "ministerial." Title VII (and § 1981 in this case) does not apply to the relationship between a religious institution and its minister if such application would encroach on the Free Exercise Clause. *Alicea–Hernandez*, 320 F.3d at 702–03. To determine

whether Stately's position was ministerial, the Court does not look at ordination, but to the function of the position. *Id.* at 703. The ministerial exception is "founded upon the principle that 'perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large.'" *Id.* at 704 (quoting *Rayburn v. Gen'l Conf. of Seventh–Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985)). Thus, when a party acts as a liaison between a religious institution and "those whom it would touch with its message," she is acting in a ministerial role. *Id.*

■ In the present case, there can be little doubt that Stately was hired to act in a ministerial role. ICS requires all of its teachers to integrate Native American culture and religion into their classes; Stately was no exception. (Lewis Decl. ¶ 9; Answers to Req. for Admission ¶ 93.) Stately participated in and, from time to time, assumed a leadership role in ICS's religious ceremonies and cultural activities, like spirit pole ceremonies, opening and closing ceremonies, and traditional Indian singing. (Answers to Req. for Admission ¶¶ 21–22, 24–25, 39–43, 62, 63.) She served as a mentor to several students, expressly charged with taking a deep interest in the students' spiritual health. (Lewis Decl. ¶ 14; Warner Aff. Ex. 11.) Given her instrumental role in developing the spiritual life of her Native American students, Stately's position was unquestionably ministerial. Consequently, the Court is satisfied that ICS has at least fairly cast into doubt whether this Court has jurisdiction to hear this case given the Free Exercise Clause of the First Amendment.

## B. Establishment Clause

In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court articulated a three-prong test to determine whether a statute violates the Establishment Clause: First, a statute must have a secular legislative purpose. *Id.* at 612, 91 S.Ct. 2105. Second, the statute's principal effect must be one that does not advance or inhibit religion. *Id.* Third, the statute must not "foster an excessive government entanglement with religion." *Id.* at 613, 91 S.Ct. 2105 (quotations omitted). ICS does not contest the first two prongs. Instead, it argues that allowing Stately to assert Title VII and Section 1981 claims would foster excessive government entanglement with religion.

Entanglement may be procedural or substantive. Procedural entanglement arises out of protracted legal battles, pitting church against state, and draining religious resources away from their intended beneficiaries. *Rayburn*, 772 F.2d at 1171. Substantive entanglement occurs when " 'the Government is placed in a position of choosing among competing religious visions.' " *Bay View United Methodist Church*, 141 F.Supp.2d at 1183 (quoting *E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 465 (D.C.Cir.1996)); *see also Rayburn*, 772 F.2d at 1170–71. To determine whether government entanglement with religion is excessive, a court must consider the character and purposes of the institution, the nature of the burden imposed, and the resulting relationship between the government and the religious authority. *Rayburn*, 772 F.2d at 1169–70; *Bay View United Methodist Church*, 141 F.Supp.2d at 1183 (citing *Lemon*, 403 U.S. at 615, 91 S.Ct. 2105).

Allowing Stately to pursue her Title VII and § 1981 claims against ICS in this case would result in excessive entanglement both procedurally and substantively. ICS is a religious institution (at least as far as this record establishes) in both character and purpose. It emphasizes the spiritual development of its students through both formal ceremonies and the integration of spiritual teachings into class lessons. ICS requires its teachers to make every effort to incorporate religion into their classes. Title VII and § 1981 would burden ICS by coercing it to make employment decisions not with matters of faith in mind, but rather with eye an towards avoiding litigation. *See Rayburn*, 772 F.2d at 1170–71. Forced to consider secular standards rather than religious ones, ICS would be hampered, unable to promote its religious values as it is constitutionally entitled to do. *See Rayburn*, 772 F.2d at 1170–71. The employment decisions a religious employer makes may be motivated by its religious beliefs, not compelled by Title VII or § 1981.

If her Title VII or § 1981 claims are allowed to dictate ICS's actions, the resulting relationship between the government and ICS would be unmanageable. Courts would have to determine when ICS's religious goals do not clash with the government's goals. In addition, courts would be forced to consider whether future plaintiffs were *religious enough* for ICS, or faithfully carried out their religious obligations in the classroom.

Entanglement may also result (if it has not already) from a long, legal battle draining ICS's resources. Moreover, discovery would be calculated to reveal the thought process involved in selecting teachers at ICS. Yet, the Court has determined that Stately's position was a ministerial one. The Court may not involve itself in telling religious institutions whom to hire and fire as its ministers. Probing ICS's selection of teachers, who propagate its religious message, is an inquiry pro-

scribed by the First Amendment. Accordingly, allowing Stately to proceed on her Title VII or § 1981 claims would result in excessive entanglement. This Court has no subject-matter jurisdiction.[9]

## C. Supplemental Jurisdiction

Because the Court lacks subject-matter jurisdiction over Stately's federal law claims, it has no original jurisdiction. Consequently, the Court may not exercise supplemental jurisdiction over Stately's state-law claims. *See* 28 U.S.C. § 1367(a); *Rifkin v. Bear Stearns & Co.*, 248 F.3d 628, 634 (7th Cir.2001).

## III. CONCLUSION

The Court concludes, based on the record, that the First Amendment precludes the Court from exercising subject-matter jurisdiction over Stately's Title VII and § 1981 claims. Because the Court has no original jurisdiction over Stately's federal claims, it may not exercise supplemental jurisdiction over her state-law claims. This Court lacks subject-matter jurisdiction over the entire action.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

ICS's motion to dismiss for lack of subject-matter jurisdiction [Docket No. 34] is **GRANTED.**

ICS's Rule 7.4 expedited, nondispositive motion to extend discovery and dispositive motion deadline [Docket No. 40] is **DISMISSED** as moot.

Likewise, Stately's motion requesting counsel [Docket Nos. 50, 51] is **DISMISSED** as moot.

***

9. ICS asserts that entanglement would result if the Court were forced to determine whether ICS's activities constitute religious practice. (*See* Mem. at 25.) ICS is wrong. Determining whether something is "religious" is a threshold analysis in which the Court must engage. If it were not, any employer could hide behind the protections of the Establishment Clause. A restaurant could fire a chef, for example, and argue that making chicken is a religious practice and that the Court's involvement would require an impermissible determination of whether making chicken is a religious practice. *See, e.g., Hartwig*, 93 F.Supp.2d at 217 ("[T]he mere reference to a matter of religion does not bar this court from hearing this case under the First Amendment.").